**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan

*Attorneys for Irving H. Picard, Esq., Trustee*
*for the Substantively Consolidated SIPA Liquidation*
*of Bernard L. Madoff Investment Securities LLC*
*and the Estate of Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>Defendant. | Adv. Pro. No. 08-01789 (SMB)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>Plaintiff,<br><br>v.<br><br>JAMES LOWREY, *et al.*,<br><br>Defendants. | Adv. Pro. No. 10-04387 (SMB) |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff,<br><br>Plaintiff, | Adv. Pro. No. 10-04488 (SMB) |

|  |  |
|---|---|
| v. | |
| SOUTH FERRY BUILDING COMPANY, a New York limited partnership, EMANUEL GETTINGER, ABRAHAM WOLFSON, and ZEV WOLFSON, | |
| Defendants. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-04350 (SMB) |
| v. | |
| SOUTH FERRY #2, EMANUEL GETTINGER, AARON WOLFSON, and ABRAHAM WOLFSON, | |
| Defendants. | |
| IRVING H. PICARD, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff, | |
| Plaintiff, | Adv. Pro. No. 10-05110 (SMB) |
| v. | |
| UNITED CONGREGATIONS MESORA, | |
| Defendants. | |

## PLAINTIFF IRVING H. PICARD'S RESPONSE TO OBJECTIONS TO BANKRUPTCY COURT'S REPORT AND RECOMMENDATIONS

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................3

I.      THE TRUSTEE HAS ESTABLISHED HIS *PRIMA FACIE* CASE TO AVOID AND RECOVER THE FICTITIOUS PROFITS RECEIVED BY DEFENDANTS ..........................................................................................3

II.     THE BANKRUPTCY COURT CORRECTLY DETERMINED THE MOTIONS FOR SUMMARY JUDGMENT BECAUSE DEFENDANTS DID NOT TAKE THE TRANSFERS FOR VALUE ...............................................5

      A.    Defendants' Affirmative Defenses Have Been Litigated And Rejected Multiple Times In This Liquidation Proceeding..........................................5

      B.    Defendants Cannot Satisfy Section 548(c)'s "For Value" Requirement .....7

      C.    The Bankruptcy Court Did Not Disregard Statutory Language Or Prioritize Equity Over Well-Settled Law....................................................10

      D.    The Second Circuit's *Sharp* Decision Is Irrelevant Here..........................13

III.    DEFENDANTS' INTERPRETATION OF THE *SECTION 546(e) DECISION* IS INCORRECT AND WITHOUT MERIT .....................................15

      A.    Defendants Improperly Invoke The Mandate Rule ..................................15

            1.    The *Section 546(e) Decision* Did Not Make Any Ruling About Defendants' Value Defense ........................................................16

            2.    The *Section 546(e) Decision* Did Not Hold That The Trustee's Avoidance Actions Were Solely Governed By The Bankruptcy Code ..........................................................................18

            3.    The *Section 546(e) Decision* Did Not Determine The Enforceability Or Validity Of BLMIS Customers' Securities Contracts And Settlement Payments..............................................19

            4.    The Second Circuit's *Silverman* Decision Is Applicable Authority .........................................................................................20

**TABLE OF CONTENTS**
**(continued)**

Page

IV.   THE *ANTECEDENT DEBT DECISION* REMAINS LAW OF THE CASE
       AND APPLICABLE TO THE TRUSTEE'S AVOIDANCE ACTIONS ............22

       A.   Defendants Are Violating The Antecedent Debt Order Once Again ........23

       B.   There Is No Basis To Treat Equity Investors Differently Than Retail
             Customers ...................................................................................................25

V.    THE BANKRUPTCY COURT PROPERLY CONSIDERED AND
       APPLIED SIPA, THE BANKRUPTCY CODE AND RELATED RULES
       TO THIS PROCEEDING ........................................................................................26

       A.   Defendants' Fraudulent Transfers Constitute Customer Property in a
             SIPA Proceeding........................................................................................26

       B.   SIPA Empowers a Trustee to Recover Customer Property ......................27

       C.   The Second Circuit's *Colonial Realty* and *Fairfield* Decisions Do Not
             Undermine The Bankruptcy Court's Report and Recommendations ........32

       D.   Defendants' Repeated Arguments About SIPA and Section 548(c)
             Fail as a Matter of Law .............................................................................34

             1.    Defendants' "At The Time Of Transfer" Argument
                   Has No Relevance In A Ponzi Scheme..............................35

             2.    Madoff's Purported Obligations To Defendants Do
                   Not Provide Value, Nor Does The Trustee Have To
                   Avoid Any Such Obligations .............................................36

       3.    Defendants' Oft Repeated State Law Arguments Remain
             Unavailing...................................................................................37

             4.    Permitting Enforcement of Unenforceable Contracts
                   Pursuant to Section 29(b) of the 1934 Act Would
                   Dilute The Fund Of Customer Property.............................39

             5.    Defendants' Asserted Adjustments Under State Or
                   Federal Law Do Not Constitute Value Under Section
                   548(c) .................................................................................41

VI.   THE BANKRUPTCY COURT DID NOT GRANT THE TRUSTEE AN
       UNPLEADED CLAIM BASED ON THE SEC'S FINANCIAL
       RESPONSIBILITY RULES AGAINST DEFENDANTS ....................................44

       A.   As The Customer Protection Rule Makes Clear, Customer Property
             Cannot Be Used To Satisfy Valid Debts Of Broker-Dealer ....................45

**TABLE OF CONTENTS**
**(continued)**

**Page**

VII.    THE TRUSTEE'S NETTING METHOD AND VALUE
        CALCULATIONS ARE WHOLLY CONSISTENT WITH THE
        SECTION 548(a) REACH-BACK PERIOD..........................................................48

CONCLUSION..........................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re A.R. Baron Co., Inc.*,
226 B.R. 790 (Bankr. S.D.N.Y. 1998).................................................................................31

*In re Adler Coleman Clearing Corp.*,
198 B.R. 70 (Bankr. S.D.N.Y. 1996)...................................................................................12

*In re Asia Global Crossing Ltd.*,
333 B.R. 199 (Bankr. S.D.N.Y. 1999).................................................................................39

*Balaber Strauss v. Sixty Five Brokers* (*In re Churchill Mortg. Inv. Corp.*),
256 B.R. 664 (Bankr. S.D.N.Y. 2000)...................................................................................8

*Baldi v. Lynch (In re McCook Metals, LLC)*,
319 B.R. 570 (Bankr. N.D. Ill. 2005) ................................................................................36

*Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.)*,
478 B.R. 570 (S.D.N.Y. 2012)............................................................................................45

*Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*,
362 B.R. 624 (Bankr. S.D.N.Y. 2007)....................................................................4, 30, 40

*Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*),
397 B.R. 1 (S.D.N.Y. 2007).................................................................................................4

*In re Bernard L. Madoff Inv. Sec. LLC*,
424 B.R. 122 (Bankr. S.D.N.Y. 2010)...................................................................................9

*In re Bernard L. Madoff Inv. Sec. LLC*,
654 F.3d 229 (2d Cir. 2011), *cert. denied sub nom.* 567 U.S. 934 (2012) ................... *passim*

*In re Bernard L. Madoff Inv. Sec. LLC*,
No. 16-413-BK(L), 697 F. App'x 708 (2d Cir. June 1, 2017)........................................ *passim*

*In re Bernard L. Madoff Inv. Secs. LLC*,
No. 15 Civ. 1151 (PAE), 2016 WL 183492 (S.D.N.Y. Jan. 14, 2016).............................51, 52

*In re Bernard L. Madoff*,
No. AP 08-01789 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. Mar. 22, 2018) ........................................................................................................................1, 17

*In re Bethune*,
18 B.R. 418 (Bankr. N.D. Ala. 1982) ................................................................................52

*BFP v. Resolution Trust Corp.*,
511 U.S. 531 (1994).............................................................................................................35

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Boston Trading Grp. v. Burnazos*,
  835 F.2d 1504 (1st Cir. 1987).............................................................................14

*Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M.
  Fabrikant & Sons, Inc.)*,
  No. 06-12737 (SMB), 2009 WL 3806683 (Bankr. S.D.N.Y. Nov. 10, 2009).........36

*California Pub. Empls. Retirement Sys. v. ANZ Secs., Inc.*,
  137 S. Ct. 2042 (2017)...............................................................................49, 52

*Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC* (*In re
  Bayou Group, LLC*), 439 B.R. 284, 308 (S.D.N.Y. 2010).............................. *passim*

*In re Colonial Realty Co.*,
  980 F.2d 125 (2d Cir. 1992)...................................................................32, 33, 34

*Cox v. Nostaw (In re Central. Ill. Energy Coop.)*,
  526 B.R. 786 (Bankr. C.D. Ill. 2015)..................................................................38, 39

*CTS Corp. v. Waldburger*,
  134 S. Ct. 2175 (2014)..................................................................................50

*In re Davis*,
  138 B.R. 106 (Bankr. M.D. Fla. 1992) ..............................................................52

*Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*,
  160 B.R. 1 (Bankr. D.D.C. 1993) ......................................................................39, 40

*Dobin v. Hill (In re Hill)*,
  342 B.R. 183 (Bankr. D.N.J. 2006) ...................................................................35

*Donell v. Kowell*,
  533 F.3d 762 (9th Cir. 2008) ...................................................................... *passim*

*Donell v. Mojtahedian*,
  976 F.Supp.2d 1183 (C.D. Cal. 2013) .............................................................50, 51

*Dowden v. Cross County Bank (In re Brittenum)*,
  97 B.R. 503 (E.D. Ark. 1987)..........................................................................27

*Found. Ventures, LLC v. F2G, LTD.*,
  No. 08 Civ. 10066 (PKL), 2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010).............40

*Fourco Glass Co. v. Transmirra Prods. Corp.*,
  353 U.S. 222 (1957)....................................................................................11

**TABLE OF AUTHORITIES**
**(continued)**

*Freeman v. Marine Midland Bank-N.Y.*,
    419 F. Supp. 440 (E.D.N.Y. 1976) ....................................................................40

*Gowan v. The Patriot Grp., LLC* (*In re Dreier LLP*),
    452 B.R. 391 (Bankr. S.D.N.Y. 2011)...................................................................8

*In re Hanover Square Sec.*,
    55 B.R. 235 (Bankr. S.D.N.Y. 1985)...................................................................12

*Hill v. Spencer Savings & Loan Assoc. (In re Bevill Bresler, Inc.)*,
    83 B.R. 880 (D.N.J. 1988) ...........................................................................28, 29

*Jahn v. Char (In re Incentium, LLC)*,
    473 B.R. 264 (Bankr. E.D. Tenn. 2012) .............................................................39

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*,
    310 F.3d 796 (5th Cir. 2002) ..............................................................................35

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*,
    561 U.S. 89 (2010)...............................................................................................11

*In re Lehman Bros. Holdings, Inc.*,
    445 B.R. 143 (Bankr. S.D.N.Y. 2011).................................................................26

*Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros.*
    *Holdings Inc.)*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012).................................................................39

*In re Lyon*,
    360 B.R. 749 (Bankr. E.D.N.C. 2007).................................................................52

*In re Maui Indus. Loan & Fin. Co.*,
    454 B.R. 133 (Bankr. D. Haw. 2011) ..................................................................52

*McHenry v. Dillworth (In re Caribbean Fuels Am., Inc)*,
    No. 16-15786, 2017 WL 2703541 (11th Cir. June 22, 2017)...............................35

*In re Merrill Lynch, Pierce, Fenner & Smith Inc.*,
    Exchange Act Release No. 34–78141, 2016 WL 4363431 (June 23, 2016) .........47

*Merrill v. Abbott (In re Indep. Clearing House Co.)*,
    77 B.R. 843 (D.Utah 1987)..................................................................................40

*Mills v. Electric Auto-Lite Co.*,
    396 U.S. 375 (1970).............................................................................................40

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Nat'l Union Fire Ins. Co. v. Camp (In re Gov't Secs. Corp.),*
   972 F.2d 328 (11th Cir. 1992) ....................................................................12, 13

*Picard v. Cohen,*
   Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. April
   25, 2016) ....................................................................................................... *passim*

*Picard v. Cohen,*
   550 B.R. 241 (Bankr. S.D.N.Y. 2016)........................................................................5

*Picard v. Cohmad Sec. Corp. (In re BLMIS),*
   454 B.R. 317 (Bankr. S.D.N.Y. 2011).......................................................................8

*Picard v. Fairfield Greenwich Ltd.,*
   762 F.3d 199 (2d Cir. 2014)......................................................................................32

*Picard v. Greiff,*
   476 B.R. 715 (S.D.N.Y. 2012)............................................................................ *passim*

*Picard v. Ida Fishman Revocable Trust (In re Madoff Sec.),*
   773 F.3d 411 (2d Cir. 2014)................................................................................ *passim*

*Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC),*
   721 F.3d 54 (2d Cir. 2013)..................................................................................33, 45

*Picard v. Katz,*
   462 B.R. 447 (S.D.N.Y. 2011)....................................................................................7

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),*
   458 B.R. 87 (Bankr. S.D.N.Y. 2011).......................................................................45

*Redmond v. SpiritBank (In re Brooke Corp.),*
   541 B.R. 492 (Bankr. D. Kan. 2015) .......................................................................35

*Scholes v. Lehmann,*
   56 F.3d 750 (7th Cir. 1995) .........................................................................10, 14, 34

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Barnard L.
   Madoff),*
   531 B.R. 439 (Bankr. S.D.N.Y. 2015)................................................................ *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
   499 B.R. 416 (S.D.N.Y. 2013)............................................................................ *passim*

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.),*
   779 F.3d 74 (2d Cir. 2015)..................................................................................42, 43

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*SEC v. JNT Investors, Inc.*,
   No. 72 Civ. 681, 1978 WL 1137 (S.D.N.Y. Feb. 9, 1978) ................................................40, 41

*SEC v. S. J. Salmon & Co.*,
   375 F. Supp. 867 (S.D.N.Y. 1974)......................................................................................41

*Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.)*,
   84 F.3d 1286 (10th Cir. 1996) ..................................................................... *passim*

*Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
   403 F.3d 43 (2d Cir. 2005)...........................................................................13, 14

*Silverman v. Cullin (In re Agape World, Inc.)*,
   633 F. App'x. 16 (2d Cir. 2016) .................................................................. *passim*

*Silverman v. Cullin*,
   No. 14 Civ. 4248 (JMA), 2015 WL 1509583 (E.D.N.Y. Mar. 31, 2015)..............................20

*SIPC v. Charisma Secs. Corp.*,
   506 F.2d 1191 (2d Cir. 1974)............................................................................12

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
   549 U.S. 443 (2007)..........................................................................................11

*Trefny v. Bear Stearns Sec. Corp.*,
   243 B.R. 300 (S.D. Tex. 1999) ........................................................................30

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
   843 F.3d 561 (2d Cir. 2016).............................................................................9

*United States v. Ben Zvi*,
   242 F.3d 89 (2d Cir. 2001)...............................................................................15

**Statutes**

11 U.S.C. § 541(a)(3)............................................................................................29

11 U.S.C. § 546(a) ...............................................................................................24

11 U.S.C. § 546(e) ............................................................................... *passim*

11 U.S.C. § 548....................................................................................36, 49, 50

11 U.S.C. § 548(a)(1) ........................................................................... *passim*

11 U.S.C. § 548(a)(1)(A) ...................................................................... *passim*

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

11 U.S.C. § 548(c) ................................................................................................. *passim*

11 U.S.C. § 741(7)(A)(i) ....................................................................................19

11 U.S.C. § 726 ..................................................................................................12

15 U.S.C. § 78aaa ................................................................................................ *passim*

15 U.S.C. § 78cc(b) ............................................................................................24

15 U.S.C. § 78fff(b) ......................................................................................11, 18

15 U.S.C. § 78fff-2(c)(3) ...................................................................................... *passim*

15 U.S.C. § 78*lll*(4) ...................................................................................26, 27, 46

15 U.S.C. § 78*lll*(4)(D) ......................................................................................26

11 U.S.C. § 771(a)(2) ..........................................................................................24

Cal. Civ. Code § 3439.09(c) ...............................................................................51

New York Uniform Commercial Code § 8-501 ...................................................24

Public Law 91- 598 sec. 7(d), (1970) .................................................................46

Securities Act of 1933 § 12(a)(2)........................................................................24

**Rules**

N.Y. C.P.L.R. § 5001 ..........................................................................................42

17 C.F.R. § 240.15c3-3 ........................................................................................ *passim*

17 C.F.R. § 240.10b–5 ........................................................................................24

17 C.F.R. § 240.15c3-3(f) ...................................................................................27

17 C.F.R. § 240.15c3-3(l) ...................................................................................48

S.E.C. Rule 10b-5 ...............................................................................................23

**Other Authorities**

Broker-Dealers; Maintenance of Certain Basic Reserves,
    Exchange Act Release No. 34-9856, 1972 WL 125352 (Nov. 13, 1972).................................46

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Customers' Securities and Funds,
  Exchange Act Release No. 9775, 1972 WL 125434 (Sept. 14, 1972)........................45, 46, 47

Michael E. Don & Josephine Wang, *Stockbroker Liquidations under the*
  *Securities Investor Protection Act and Their Impact on Securities Transfers*,
  12 Cardozo L. Rev. 509 (1990) ............................................................................................30

Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069 (2002)..........................47

Steven D. Lofchie, *Lofchie's Guide to Broker-Dealer Regulation* (3d ed. 2005) ........................47

Plaintiff Irving H. Picard (the "Trustee"), as trustee for the liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") under the Securities Investor Protection Act ("SIPA"), 15 U.S.C. §§ 78aaa *et seq.*, and the substantively consolidated estate of Bernard L. Madoff under Chapter 7 of the United States Bankruptcy Code, by and through his undersigned counsel, hereby submits his response to the Rule 9033 Objections (the "Objections") to the Bankruptcy Court's Report and Recommendations,[1] as filed by Defendants (together with the Trustee, the "Parties")[2] in the above-captioned actions (the "Adversary Proceedings"). The Adversary Proceedings were consolidated for purposes of the hearing on the Parties' summary judgment motions.[3]

## PRELIMINARY STATEMENT

The Bankruptcy Court recommended the Trustee's summary judgment motion be granted and Defendants' denied based on stipulated facts. Through those stipulated facts, Defendants admitted that BLMIS operated a Ponzi scheme and that they were customers who received fictitious profits from the Ponzi scheme within the two years preceding the collapse of BLMIS on December 11, 2008 (the "Filing Date"). By their Objections, Defendants seek to keep all the fictitious profits they received by challenging well-settled law defining "value" under section 548(c) of the Bankruptcy Code. No amount of convoluted interpretation, however, can rebut the rules of law set forth by the Bankruptcy Court and the District Court multiple times in this SIPA

---

[1] *See* Report and Recommendation To The District Court To Grant The Plaintiff's Motion For Summary Judgment, Deny The Defendants' Motions For Summary Judgment and Enter Money Judgments In Favor of the Plaintiff, *In re Bernard L. Madoff*, No. AP 08-01789 (SMB), 2018 WL 1442312 (Bankr. S.D.N.Y. Mar. 22, 2018) (hereinafter the "*Report and Recommendations*").

[2] Unless otherwise defined, terms capitalized herein shall have the meaning ascribed to them in the Trustee's motion for summary judgment in the above-captioned adversary proceedings, and in line with the Bankruptcy Court's *Report and Recommendations*, "ECF Doc. # _" refers to documents filed on the docket of the Lowrey Action, unless stated otherwise.

[3] *See* Defendants' Joint Memorandum Of Law In Support Of Rule 9033 Objections To Bankruptcy Court's Report And Recommendations (hereinafter the "Objections"), ECF No. 116.

liquidation, as well as long-standing case law addressing fictitious profits in Ponzi schemes. Defendants did not give value beyond their deposits of principal with BLMIS, and cannot argue that the payments of fictitious profits received from BLMIS satisfied an antecedent debt or otherwise provided value under section 548(c) of the Bankruptcy Code.

In challenging the Bankruptcy Court's *Report and Recommendations*, Defendants rely extensively on arguments raised and rejected numerous times by multiple courts in these actions, in an effort to redefine value to permit Defendants to keep the fictitious profits they received from BLMIS.[4]  In short, the fictitious profits Defendants received were not offset by any further investments with BLMIS, and served only to reduce BLMIS's funds to the detriment of other BLMIS investors.

Value cannot be provided in exchange for the withdrawal of fictitious profits in a SIPA liquidation because SIPA establishes a separate customer property fund for priority distribution to customers according to their "net equities."  A customer who deposited more than they withdrew has a "net equity" claim in the amount of the difference.  Those customers who withdrew more than they deposited received fictitious profits.  Based on this, any amount that Defendants retain above their principal investments depletes, on a dollar-for-dollar basis, the fund of customer property available to satisfy allowed net equity claims of less fortunate customers who have yet to receive the return of even their principal from BLMIS.  Allowing Defendants to offset their false profits with non-customer claims—whether framed as securities

---

[4] This includes but is not limited to: Post-Trial Proposed Findings of Fact and Conclusions of Law, *Antecedent Debt Decision*, 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016), ECF No. 90 ("*Cohen Decision*"), adopted mem., No. 16 Civ. 05513 (LTS) (S.D.N.Y. Feb. 24, 2017), ECF No. 24 (Memorandum Order Adopting Proposed Findings of Fact and Conclusions of Law) ("*Cohen District Court Decision*"); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439 (Bankr. S.D.N.Y. 2015) ("*Omnibus Good Faith Decision*"); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 499 B.R. 416 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"); *Picard v. Greiff*, 476 B.R. 715 (S.D.N.Y. 2012).

obligations, contract claims, or tort claims—improperly elevates and equates these claims to priority customer property claims meant to recover the return of principal, which is contrary to the mandates of SIPA.

As set forth in the underlying briefing and as agreed by Defendants' own stipulations of undisputed material facts (the "Joint Stipulation"),[5] BLMIS transferred a collective $41,295,673 to Defendants in excess of their principal deposits, with actual fraudulent intent in connection with a Ponzi scheme, within the two years prior to the Filing Date on December 11, 2008. This amount constitutes fictitious profits, whether or not Defendants like that phrase. With no viable legal defenses, Defendants are liable for the full amount of the fictitious profits received from BLMIS. The Trustee respectfully requests that the District Court adopt the Bankruptcy Court's *Report and Recommendations* in full and enter a final judgment in favor of the Trustee in the sum of $41,295,673.[6]

## ARGUMENT

### I.   THE TRUSTEE HAS ESTABLISHED HIS *PRIMA FACIE* CASE TO AVOID AND RECOVER THE FICTITIOUS PROFITS RECEIVED BY DEFENDANTS

The Bankruptcy Court correctly found that the Trustee had satisfied his burden of proof on his affirmative claims to avoid and recover the fictitious profits received by Defendants. *Report and Recommendations,* 2018 WL 1442312, at *4. And Defendants admit that they "do not contest the Trustee's *prima facie* case." (Objections at 19.)

As the Parties stipulated, Defendants were customers of BLMIS and opened accounts at BLMIS for the stated purpose of trading securities for their benefit. *Report and Recommendations,* 2018 WL 1442312, at *2. "During the lives of their accounts, each

---

[5] As the Bankruptcy Court has done, for ease of reference and unless otherwise indicated, the Trustee will refer to paragraphs in the Joint Stipulation entered in the Lowrey Action.
[6] The Trustee also seeks prejudgment interest on this amount, which will be the subject of a separate request to the Bankruptcy Court. *See infra,* n. 13.

Defendant withdrew more money than it deposited in its BLMIS account," representing fictitious profits from the Ponzi scheme.[7]  *Id.*  During the two-year period preceding the Filing Date, Defendants withdrew a collective $41,295,673 in excess of principal (the "Two-Year Transfers").  *Id.* at *2.  Defendants stipulated to the amount of the Two-Year Transfers applicable to their respective BLMIS accounts, and that BLMIS made the Two-Year Transfers to Defendants with the "actual intent to hinder, delay, or defraud" creditors.  *Id.* at *4.  Given the Parties' stipulations, the Bankruptcy Court correctly found that the transfers from BLMIS to Defendants are deemed to have been made with actual fraudulent intent.[8]  *Id.*

Defendants thus admitted they received fictitious profits from their BLMIS accounts during the two years preceding the Filing Date.  Therefore, Defendants can avoid liability only if they can establish one or more of their purported affirmative defenses under Bankruptcy Code section 548(c).  They did not, and cannot.

---

[7] Defendants assert that the Trustee inappropriately described those payments as "fictitious profits" (Objections at 7), but the Parties stipulated to that characterization.  (*See* Joint Stipulation, ¶¶ 12-13 ("BLMIS utilized commingled customer monies to fund its operations, as well as to fund the withdrawal of fictitious profits and principal for other customers. The investment advisory business . . . did not actually trade securities for customers and did not generate any legitimate profits for customer accounts.")). In addition, this terminology has been used in other cases.  *See e.g., Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 627 (Bankr. S.D.N.Y. 2007) ("*Bayou I*") (recovery of fraudulent conveyances of "non-existent principal and fictitious profits" received pursuant to defendants' "purported but non-existent interests" in the hedge funds, as reflected in false financial reports). Regardless, the relevant point is that Defendants withdrew more than they deposited with BLMIS and those funds must be returned to the estate.

[8] The Bankruptcy Court further noted that BLMIS's fraudulent intent could be "presumed from the existence of the Ponzi scheme, because 'transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'" *Report and Recommendations,* 2018 WL 1442312, at *4 (quoting *Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007)).

## II.    THE BANKRUPTCY COURT CORRECTLY DETERMINED THE MOTIONS FOR SUMMARY JUDGMENT BECAUSE DEFENDANTS DID NOT TAKE THE TRANSFERS FOR VALUE

### A.    Defendants' Affirmative Defenses Have Been Litigated And Rejected Multiple Times In This Liquidation Proceeding

As an initial matter, the Bankruptcy Court has made clear that Defendants' antecedent debt/value arguments were "rejected by the District Court expressly or by implication" in decision after decision issued in this liquidation proceeding.[9]  *Report and Recommendations,* 2018 WL 1442312, at *6; *see also Cohen Decision,* 2016 WL 1695296, at *5.  The Bankruptcy Court not only carefully reviewed each of the prior decisions, but also provided a chart reflecting the glaring repetitions of the arguments Defendants have been making since 2011.  *Report and Recommendations,* 2018 WL 1442312, at *6-9.

Indeed, defendants in this liquidation proceeding—including Defendants here—have had "several opportunities to present their antecedent debt/value arguments, those arguments have been rejected, and hearing them again will not add value to the disposition of the antecedent debt/value defense in this Court."  *Picard v. Cohen*, 550 B.R. 241, 255 (Bankr. S.D.N.Y. 2016) (denying motion to intervene in the *Cohen* proceeding on the antecedent debt/value issue); *see also Omnibus Good Faith Decision,* 531 B.R. at 466 (noting that the District Court's extensive consideration of the antecedent debt/value issue in the *Antecedent Debt Decision* "would normally foreclose further argument in this Court" because defendants "have had their day in court and Judge Rakoff's decisions are law of the case").[10]

---

[9] *See generally Greiff,* 476 B.R. 715; *Antecedent Debt Decision,* 499 B.R. 416; *Omnibus Good Faith Decision,* 531 B.R. 439; *Cohen Decision,* 2016 WL 1695296, adopted mem. *Cohen District Court Decision.*

[10] Defendants were subject to the *Antecedent Debt Decision*, as they moved to withdraw the reference from the Bankruptcy Court to determine "[w]hether the Trustee can avoid transfers BLMIS made in order to satisfy antecedent debts." *See* Memorandum of Law in Support of Motion to Withdraw Reference to the Bankruptcy Judge. *Picard v. Lowrey,* No. 12-CV-02510 (JSR) (S.D.N.Y. April 22, 2012), ECF No. 1.

More importantly, Defendants were party to, and still remain bound by, the Antecedent Debt Order,[11] which foreclosed Defendants from repeatedly raising issues that have already been decided.  The Antecedent Debt Order expressly provided that "the procedures established by this Order, or by further Order of this Court, shall constitute *the sole and exclusive procedures* for determination of the Withdrawn Antecedent Debt Issue[12] in the Adversary Proceedings (except for any appellate practice resulting from such determination), and this Court shall be the forum for such determination."   Antecedent Debt Order at 7 (emphasis added).  The District Court made clear that once the Antecedent Debt Decision was issued, all affected actions would "be returned to the Bankruptcy Court for further proceedings consistent with this Opinion and Order."  *Antecedent Debt Decision*, 499 B.R. at 416.  As a result, each time Defendants attempt to re-litigate the Withdrawn Antecedent Debt Issue, as they are doing here, they are doing so in direct violation of extant orders of the District Court.  Such tactics should not be condoned.[13]

---

Defendants also participated by intervention in the briefings for the *Omnibus Good Faith Decision. See* Memorandum of Law in Support of Motion to Intervene and Be Heard on the Issue of the Trustee's Standing to Recover Customer Property, *Picard v. Lowrey*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. March 17, 2014), ECF No. 5886.

[11] *See* Order (Relates To Consolidated Proceedings on Antecedent Debt Issues) (the "Antecedent Debt Order"), Ex. A to the Trustee's Reply Memorandum Of Law In Further Support Of His Motion For Summary Judgment, ECF No. 92-1.  For the Court's convenience, a true and correct copy of the Antecedent Debt Order is attached hereto as Exhibit A.

[12] The "Withdrawn Antecedent Issue" was previously defined by the District Court as follows: whether and to what extent (i) transfers made by Madoff Securities that the Trustee seeks to avoid were made in exchange for value, such as antecedent debts that Madoff Securities owed to the Antecedent Debt Defendants at the time of the transfers; and (ii) obligations incurred by Madoff Securities may be avoided by the Trustee, including whether they were exchanged for value, such as antecedent debts owed to the Antecedent Debt Defendants.

[13] Given that Defendants are rearguing these very same issues for at least the sixth time, such delays at the expense of the net loser victims—who have not yet recovered their full principal investments with BLMIS—necessitates awarding prejudgment interest in favor of the Trustee.  As noted in his moving papers, the Trustee reserves his right to request a hearing before the Bankruptcy Court to determine the appropriate rate to apply to the calculation of such interest.

B.    **Defendants Cannot Satisfy Section 548(c)'s "For Value" Requirement**

Despite having litigated the same issue over and over again, Defendants remain unable to demonstrate they have any defense to the Trustee's avoidance actions.  To defeat the avoidance of a transfer, Defendants have the burden of providing evidence sufficient to create a material issue of fact as to whether they took (1) "for value . . . to the extent that [they] gave value to the debtor in exchange for such transfer" and (2) "in good faith." 11 U.S.C. § 548(c).

The Parties stipulated that each Defendant made each of its withdrawals "in good faith, believing that they were entitled to these funds and lacking any knowledge of the Ponzi scheme." (Joint Stipulation ¶ 43.) Yet, fictitious profits "may [still] be recovered regardless of the customers' good faith," because "transfers made by Madoff Securities to its customers in excess of the customers' principal—that is, the customers' profits—. . . were in excess of the extent to which the customers gave value." *Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011) (internal quotations omitted); *see also Greiff*, 476 B.R. at 722-24; *Cohen Decision,* 2016 WL 1695296, at *5.  Thus, the Bankruptcy Court correctly determined that Defendants failed to satisfy section 548(c)'s "for value" requirement, finding that "[t]he Two Year Transfers did not satisfy an antecedent debt owed by the customers or provide value to the other customers." *Report and Recommendations,* 2018 WL 1442312, at *7.

With no facts in dispute, Defendants endeavor to reargue various legal theories in an attempt to create the illusion of value.  At its core, Defendants' argument is that they should be allowed to benefit from Madoff's Ponzi scheme and keep money that belongs to other customers. However, Defendants have not established anywhere in the record that they took the transfers of fictitious profits "for value," because such false profits were not on account of a valid antecedent debt. In fact, pursuant to the Joint Stipulation, there is no dispute that Defendants received fictitious profits or "withdrew . . . in excess of deposits" from their BLMIS accounts with the IA

7

Business through which they were invested, which business Defendants admit "did not actually trade securities for customers and did not generate any legitimate profits for customer accounts." (Joint Stipulation ¶¶ 22, 30, 38 & 13.)  On this basis alone, the Bankruptcy Court's *Report and Recommendations* should be fully adopted.

As the Bankruptcy Court previously determined, it is a "well-settled rule in Ponzi scheme cases that net winners must disgorge their winnings." *Omnibus Good Faith Decision*, 531 B.R. at 462.[14]  "[I]nvestors may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments, while distributions exceeding their investments constitute fraudulent conveyances which may be recovered by the Trustee." *Balaber Strauss v. Sixty Five Brokers* (*In re Churchill Mortg. Inv. Corp.*), 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000); *Gowan v. The Patriot Grp., LLC* (*In re Dreier LLP*), 452 B.R. 391, 440 n. 44 (Bankr. S.D.N.Y. 2011) ("The Court's conclusion that the Defendants did not provide 'reasonably equivalent value' for the payments in excess of principal is consistent with those courts that have held that investors in a Ponzi scheme are not entitled to retain the fictitious profits they received"); *Cohen Decision,* 2016 WL 1695296, at *11 (as a matter of law, it is universally accepted that "[n]et winners cannot argue that the payment of fictitious profits satisfied an antecedent debt or obligation and provided value within the meaning of Bankruptcy Code § 548(c)"); *Picard v. Cohmad Sec. Corp. (In re BLMIS),* 454 B.R. 317, 333 (Bankr. S.D.N.Y. 2011) (finding that "any payments. . . receive[d] in excess of their principal investments can be avoided by the Trustee as fraudulent

---

[14] Defendants argue that the Trustee made an improper "disgorgement claim" against Defendants (Objections at 50), and that Bankruptcy Court "erroneously found that Defendants were subject to the equitable remedy of disgorgement of payments" (Objections at 27.)  However, as Defendants note, the Trustee never pleaded disgorgement in the Avoidance Actions, and in his motion papers, only quoted it as phrased in cited caselaw, and/or as a synonym of the words "return" or even "to pay back" the Two-Year Transfers.  More importantly, contrary to Defendants' assertion, the Bankruptcy Court made no such determination of any purported disgorgement claim, and in fact did not even mention the word "disgorgement" in its *Report and Recommendations.*

transfers"). In fact, "virtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers." *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 337 (S.D.N.Y. 2010) (*"Bayou IV"*) (internal quotations omitted).

In this context, it is not surprising that the Second Circuit "continues to refuse" to "treat[ ] fictitious and arbitrarily assigned paper profits as real" or to give "legal effect to Madoff's machinations." *In re Bernard L. Madoff Inv. Sec. LLC*, No. 16-413-BK(L), 697 F. App'x 708, 713 (2d Cir. June 1, 2017) (*"Second Circuit Inter-Account Decision"*) (citing *In re Bernard L. Madoff Inv. Sec. LLC*, 424 B.R. 122, 235 (Bankr. S.D.N.Y. 2010) (*"Bankruptcy Court Net Equity Decision"*)). The *Second Circuit Inter-Account Decision* further reinforces the rule that a transferee does not give value beyond his deposits of principal and therefore must return net winnings, as the Second Circuit stated that it "will not lend its power to assist or protect a fraud." *Id.* (citing *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 568 (2d Cir. 2016)). While the briefing on inter-account transfers in this SIPA liquidation was limited to the net equity calculations for purposes of customer claims, both the Bankruptcy Court and District Court have made clear that "a customer's net equity and the amounts sought in avoidance and recovery proceedings (assuming the customer's good faith) are two sides of the same coin." *Antecedent Debt Decision*, 499 B.R. at 420; *see also Report and Recommendations*, 2018 WL 1442312, at *7 (stating "the assertion of a general damage claim as an offset against the recovery of customer property has the same effect as the assertion of that claim against the customer property estate . . . [t]he setoff grants the defendant a dollar for dollar benefit for his

'claim,' while the net losers that hold net equity claims . . . will receive less than a dollar for dollar recovery on their net equity claims").

This is also a well-settled rule among other Circuits. As the Fifth Circuit articulated in *Janvey v. Brown*, "[t]o allow an [investor] to enforce his contract to recover promised returns in excess of his undertaking would be to further the debtors' fraudulent scheme at the expense of other [investors] . . .[because] any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme." 767 F.3d 430, 441 (5th Cir. 2014); *see also Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir. 2008) (declining to permit offsets, noting that "[i]f each net winner could shield his gains in their entirety in this manner . . .the multitude of victims who lost their entire investments would receive no money"); *Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.),* 84 F.3d 1286, 1290 (10th Cir. 1996) (noting the contract was "unenforceable" to the extent it gave a right to payment in excess of their original investment); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (finding the paying out of profits to net winner "conferred no benefits on the [net losers] but merely depleted their resources faster.")

Not a single case cited by Defendants changes the rule of law that Defendants may only seek the protections of the value defense contained in section 548(c) to the extent of their principal investments with BLMIS.

## C.   The Bankruptcy Court Did Not Disregard Statutory Language Or Prioritize Equity Over Well-Settled Law

Contrary to Defendants' assertions, the Bankruptcy Court applied the plain language of the statute and was not motivated by equitable concerns. Defendants allege that the Bankruptcy Court improperly limited Defendants' section 548(c) affirmative defenses, stating that the court "refused to credit valid state law obligations to the customers not because it disagreed with Defendants' interpretation of Section 548(c) but because it believed that 548(c) was inequitable

here." (Objections at 27.)   However, that is a misinterpretation of the *Report and Recommendations,* as the Bankruptcy Court reached its conclusions based on its review and analysis of the relevant statutes, well-settled law, and prior case precedent in this liquidation proceeding.[15]

Among other things, Defendants choose to ignore that the law primarily governing these proceedings is SIPA.[16]   While SIPA provides that a SIPA trustee is "vested with the same powers and title with respect to the debtor and the property of the debtor … as a trustee in a case under Title 11," "the provisions of the Bankruptcy Code apply only '[t]o the extent consistent with the provisions of this chapter." SIPA § 78fff(b); *see also Antecedent Debt Decision*, 499 B.R. at 420, 423 (internal quotations omitted).   The District Court has held that the Trustee's powers to avoid transfers under the Bankruptcy Code "must be interpreted through the lens of SIPA's statutory scheme."[17] *Antecedent Debt Decision*, 499 B.R. at 423.   The understanding of what may constitute "value" in this proceeding is directly informed by SIPA.   *See Cohen Decision*, 2016 WL 1695296 at *10.

---

[15] For example, Defendants ignore the fact the District Court previously reviewed *de novo* the *Cohen Decision,* and adopted it in its entirety, finding the Bankruptcy Court's analysis to be "well-reasoned and thorough," and rejecting the purported precedential value Defendants repeatedly attempt to accord to the *Section 546(e) Decision.  See generally Cohen District Court Decision,* at *2.

[16] Defendants also cite to inapposite cases for the general concept that courts should try to reconcile provisions among different statutes whenever possible.   This principle is neither new nor controversial.   None of the cited cases addresses Defendants' recycled arguments involving the antecedent debt/value defense under section 548(c) of the Bankruptcy Code.   None of the cited cases could even constitute controlling authority that might conceivably alter the *Report and Recommendations,* or the previous rulings of the Bankruptcy Court and the District Court.   *See e.g., Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.,* 561 U.S. 89 (2010) (breach of contract action brought by a shipper of goods); *Fourco Glass Co. v. Transmirra Prods. Corp.,* 353 U.S. 222 (1957) (venue dispute in patent infringement action); *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.,* 549 U.S. 443 (2007) (recovery of attorneys' fees in bankruptcy litigation).

[17] Defendants erroneously claim that the Bankruptcy Court concluded that SIPA "impliedly repeals" the Bankruptcy Code's limitations on avoidance powers and instead provides a SIPA trustee with greater avoidance powers.   (Objections at 31.)

SIPA creates a priority fund of "customer property," which is separate from the general estate, for distribution exclusively to "customers." *See In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 233 (2d Cir. 2011), *cert. denied sub. nom.* 567 U.S. 934 (2012). Only "customers" may recover their "net equity" from the fund of "customer property." *See In re Adler Coleman Clearing Corp.*, 198 B.R. 70, 71 (Bankr. S.D.N.Y. 1996) (explaining that a "person whose claim against the debtor qualifies as a 'customer claim' is entitled to preferential treatment"); *In re Hanover Square Sec.*, 55 B.R. 235, 237 (Bankr. S.D.N.Y. 1985) ("Affording customer status confers preferential treatment."). Unlike customers, general creditors cannot share in customer property, and any general estate is distributed in the order of priority established in section 726 of the Bankruptcy Code. *See* SIPA § 78fff(e). The District Court explained that if it allowed customers like Defendants, who have no net equity claims, to retain fictitious profits of customer property because these payments satisfied their purported claims against the debtor, this retention would deplete the customer fund available for distribution to customers. *See Greiff*, 476 B.R. at 728; *Antecedent Debt Decision*, 429 B.R. at 424. "Every offset against the trustee's avoidance claim based on a non-SIPA claim under state or federal law diminishes the SIPA trustee's recovery." *Cohen*, 2016 WL 1695296, at *13.

Defendants point to *SIPC v. Charisma Secs. Corp.*, 506 F.2d 1191 (2d Cir. 1974) and *Nat'l Union Fire Ins. Co. v. Camp (In re Gov't Secs. Corp.),* 972 F.2d 328 (11th Cir. 1992) but these cases actually support the Trustee's position. (Objections at 29-31.) The Second Circuit's decision in *Charisma* supports the Bankruptcy Court's conclusion that "[a] provision is 'inconsistent' with SIPA if it conflicts with an explicit provision of the Act or if its application would substantially impede the fair and effective operation of SIPA without providing significant countervailing benefits." 506 F.2d at 1195. The same is true for *In re Gov't Secs. Corp.*, in

which the 11th Circuit stated that "[i]t makes no sense to suggest that Congress intended that the SIPA trustee have less power than an ordinary bankruptcy trustee to gather assets into the debtor's estate." 972 F.2d at 331. In the cases before this Court, if Defendants were permitted to retain the payments of fictitious profits, which they assert were on account of federal or state law claims against BLMIS, they would essentially be elevating general estate claims to "priority status" as customer property claims. This is in direct contravention of the customer provisions of SIPA. As the Bankruptcy Court explained "SIPA creates a priority customer property estate to be distributed pro rata to customers holding net equity claims, and '[p]ermitting a net winner to offset a non-net equity claim against the trustee's claim for the return of customer property effectively allows the net winner to recover his non–SIPA claim at the expense of net losers in violation of SIPA's priority rules.'" *Report and Recommendations,* 2018 WL 1442312, at *8 (citing *Cohen Decision,* 2016 WL 1695296, at *11.) The Bankruptcy Court's *Report and Recommendations* is based in law, not equity.

### D.    The Second Circuit's *Sharp* Decision Is Irrelevant Here

Lacking support in the numerous decisions issued in these SIPA proceedings, Defendants turn to the inapposite *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43 (2d Cir. 2005) ("*Sharp*"), arguing that fraudulent transfer law does not prevent a debtor from satisfying valid debts existing at the time of the transfer, even if the funds used to make payments were stolen from third parties and/or were made in connection with a fraud. (Objections at 3-4, 56-59 (citing *Sharp,* 403 F.3d at 54-55).) However, Defendants' reliance on *Sharp* to argue that section 548(c) permits them to retain transfers that purportedly "satisfied a valid debt and were not avoidable" is grounded upon the false presumption that they actually possessed a *bona fide* antecedent debt. 403 F.3d at 47. That presumption is wrong. It is

precisely because Defendants cannot establish any "valid" antecedent debts or obligations to protect their fictitious profits that their section 548(c) defense fails as a matter of law.

In contrast, *Sharp* involved the repayment of a *legitimate* loan from State Street Bank and Trust Company, which loan the trustee in that case did not challenge.   (Objections at 60.) Unlike "the lawful and disclosed payment of a valid contractual antecedent debt in *Sharp,*" the fraudulent transfers at issue here were account balances as misrepresented in the fraudulent financial statements which were themselves inherently fraudulent and constituted an "integral and essential" component of the fraudulent Ponzi scheme, as alleged in the Trustee's Avoidance Actions and as admitted by Defendants in their Joint Stipulations.   (*See* Joint Stipulation ¶ 50.) *See also In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 242 (2d Cir. 2011) ("*Second Circuit Net Equity Decision*") (noting that "the BLMIS customer statements reflect impossible transactions" for which the Trustee is not required to treat "as reflections of reality").   The payments here of fictitious account balances and profits were "inherently deceitful and unlawful" and were necessarily made with intent to "hinder, delay or defraud" present and future creditors. *Id.*   In contrast, *Sharp* involved only a disclosed repayment of a valid antecedent debt actually owed to the bank.[18]

Here, Defendants' receipt of fictitious profits was not offset by anything of value— certainly not by any further investments of principal with BLMIS—and only depleted BLMIS's fund of customer property further.   *See Omnibus Good Faith Decision*, 531 B.R. at 463.   As the Seventh Circuit explained in *Scholes*, the "injustice in allowing [a defendant] to retain [its] profit

---

[18] The same is true of Defendants' reliance on *Boston Trading Grp. v. Burnazos*, 835 F.2d 1504, 1506 (1st Cir. 1987), in which the debtor's fraudulent transfer claims did not emanate from any Ponzi scheme activity, but rather from transfers made in connection with the purchase of a business and payment under a settlement of a state court lawsuit.

at the expense of the defrauded investors" could be circumvented <u>only</u> if it "was offset by an

equivalent benefit to the estate."  56 F.3d at 757.  Thus, *Sharp* has no relevance here.

## III.   DEFENDANTS' INTERPRETATION OF THE *SECTION 546(e) DECISION* IS INCORRECT AND WITHOUT MERIT

As the Bankruptcy Court has found, and the District Court has confirmed, the Section

546(e) Decision does not alter the treatment of fictitious profits in this Ponzi scheme.  *See e.g.,*

*Cohen Decision,* 2016 WL 1695296, at *12-13, adopted mem.  *Cohen District Court Decision;*[19]

*Report and Recommendations,* 2018 WL 1442312, at *12; *Silverman v. Cullin* (*In re Agape*

*World, Inc.*), 633 F. App'x. 16, 17 (2d Cir. 2016). Defendants assert that the Bankruptcy Court's

reliance on the *Antecedent Debt Decision*, the *Cohen Decision*, [20] and other decisions in this

liquidation is inconsistent with the mandate of the *Section 546(e) Decision.*  (Objections at 4, 32-

36.)   However, Defendants' effort to stretch the bounds of the *Section 546(e) Decision* to

manufacture a new legal defense is unsustainable.

### A.   <u>Defendants Improperly Invoke The Mandate Rule</u>

The crux of Defendants' argument concerning this issue is that the Bankruptcy Court

followed the express mandate of the *Antecedent Debt Decision* instead of following the *Section*

*546(e) Decision.*  The Bankruptcy Court explained that the mandate rule "compels compliance

on remand with the dictates of the superior court and forecloses relitigation of issues expressly or

impliedly decided by the appellate court."  *Report and Recommendations,* 2018 WL 1442312, at

*7 (citing *United States v. Ben Zvi,* 242 F.3d 89, 95 (2d Cir. 2001)).   However, the *Section*

---

[19] Defendants have no basis for their argument that the Bankruptcy Court erred in relying on the precedent set in the *Cohen Decision.* (Objections at 41, n. 20.)  Given the commonality in the stipulated facts entered in the *Cohen* proceeding and the Avoidance Actions, Mr. Cohen and Defendants have the same factual predicate, making the application of the *Cohen Decision* entirely appropriate here. Compare *Cohen Decision,* 2016 WL 1695296, at *2-3, with the Joint Statement.
[20] *See supra* n. 4.

*546(e) Decision* does not even address, let alone resolve, the matters addressed in the summary judgment motions and thus provides no mandate.[21]

### 1. The *Section 546(e) Decision* Did Not Make Any Ruling About Defendants' Value Defense

Defendants continue to misrepresent what the Second Circuit decided in the *Section 546(e) Decision*. The *Section 546(e) Decision* held that the "safe harbor" provision for certain financial transactions contained in section 546(e) of the Bankruptcy Code precluded certain claims by the Trustee and limited his avoidance powers in "good faith" cases such as Defendants' to claims under Bankruptcy Code section 548(a)(1)(A) seeking the avoidance of intentional fraudulent transfers by BLMIS. As the Bankruptcy Court made clear, the Second Circuit's *Section 546(e) Decision* never addressed, explicitly or implicitly, the question of value. *See Report and Recommendations,* 2018 WL 1442312, at *10, 13. The Second Circuit certainly did not rule that BLMIS's payments to its customers underlying the securities contract or settlement payments were made for "value" at the time of transfer pursuant to section 548(c). *Id.* at *13 (citing *Silverman*, 633 Fed.Appx. at 17).

Defendants previously raised, and the Bankruptcy Court rejected, these arguments in its *Omnibus Good Faith Decision* – in which the Lowrey defendants, represented by the same counsel, participated.[22] The Bankruptcy Court acknowledged that the *Section 546(e) Decision* determined that certain payments to customers were subject to the safe harbor of section 546(e),

---

[21] If any applicable principles may be derived from the Second Circuit, they come instead from the Second Circuit's decisions affirming the Trustee's methodologies for purposes of calculating net equity and addressing inter-account transfers. *See generally Second Circuit Net Equity Decision*, 654 F.3d 229; *Second Circuit Inter-Account Transfers,* 697 F. App'x  708.

[22] The Lowrey Action was a participant in the Omnibus Good Faith Proceeding, and the remaining defendants participated by intervention in the briefings for the *Omnibus Good Faith Decision. See* Memorandum of Law in Support of Motion to Intervene and Be Heard on the Issue of the Trustee's Standing to Recover Customer Property, *Picard v. Lowrey*, No. 08-01789 (SMB) (Bankr. S.D.N.Y. March 17, 2014), ECF No. 5886.

which thus limited the Trustee to recovering fraudulent transfers only under 11 U.S.C. §548(a)(1)(A) in cases such as Defendants'. *See Omnibus Good Faith Decision*, 531 B.R. at 469 (citing *Picard v. Ida Fishman Revocable Trust* (*In re Madoff Sec.*), 773 F.3d 411, 417-23 (2d Cir. 2013) ("*Section 546(e) Decision*")). However, "it does not follow . . . that the defendants paid value in exchange for the fictitious profits they received." *Id.* The Second Circuit did not disturb the general rule that a trustee can recover fictitious profits, because transferees in a Ponzi scheme do not give value beyond what they pay into the scheme. *Id.* at 469-70. As the Bankruptcy Court explained, "[f]ictitious profits are not profits at all but distributions of other people's money based on an arbitrary allocation of fraudulent bookkeeping entries. The [*Section 546(e) Decision*] did not address this rule and it remains the majority view." *Id.* at 470.[23] Two years later, the Second Circuit explicitly stated that it had not addressed this issue and noted "the prevailing view in the district and bankruptcy courts in this Circuit has agreed" that payments above deposits of principal to Ponzi scheme investors should be treated as fraudulent transfers. *Silverman*, 633 F. App'x. at 17 (citing *Omnibus Good Faith Decision*, 531 B.R. at 462-64 (collecting cases)).

Even after reviewing Defendants' arguments yet again on the motions for summary judgment, the Bankruptcy Court reached the same conclusions in its *Report and Recommendations,* finding the *Section 546(e) Decision* neither addressed "the 'value' defense" nor "upset the general rule in Ponzi scheme cases limiting value to principal deposits." 2018 WL 1442312, at *13.

---

[23] In fact, there was no dispute in the *Section 546(e) Decision* that the payments at issue were fraudulent transfers. 773 F.3d at 422 ("Certainly SIPC and the Trustee are correct that these transfers were also made 'in connection with' a Ponzi scheme and, as a result, were fraudulent.").

2.      The *Section 546(e) Decision* Did Not Hold That The Trustee's
        Avoidance Actions Were Solely Governed By The Bankruptcy Code

In the *Section 546(e) Decision*, the Second Circuit determined that "by enacting §546(e),
Congress provided that, for a very broad range of securities-related transfers, the interest in
finality is sufficiently important that they cannot be avoided by a bankruptcy trustee at all, except
as actual fraudulent transfers under § 548(a)(1)(A)." 773 F.3d at 423.  Contrary to Defendants'
Objections, the Second Circuit never stated that the Bankruptcy Code solely "controls avoidance
of transfers in a SIPA avoidance proceeding," or that SIPA does not permit a court "to change or
override any [of] the avoidance provision[s] of the Bankruptcy Code, whether based on the
presence of fraudulent scheme or otherwise." (Objections at 32, 35-36.)  Defendants make these
broad—and incorrect—inferences based on a distinction made in the *Section 546(e) Decision*
between SIPA and the Bankruptcy Code, in the context of the express statute of limitations
incorporated into Bankruptcy Code § 546(a).  Within that context, where a conflict exists
between SIPA and the Bankruptcy Code, if "Congress has made a clear choice, a court must
enforce Congress's will."  *Cohen Decision,* 2016 WL 1695296, at \*13 (citing *Section 546(e)
Decision,* 773 F.3d at 423).

However, actions brought under section 548(a)(1)(A), like those before the Court here,
are *exempt* from the operation of section 546(e).  Moreover, the two statutory regimes of SIPA
and the Bankruptcy Code are not "so easily separated with respect to other aspects of fraudulent
transfer litigation" including section 548(c) of the Bankruptcy Code.[24]  *Cohen Decision*, 2016
WL 1695296 at \*10.  This is because, unlike the statute of limitations embedded in the section
546(e) safe harbor, there is "no clear statutory direction that the satisfaction of claims against the
general estate provides value" for the receipt of fictitious profits from a Ponzi scheme.  *Id.* (citing

---

[24] SIPA expressly incorporates chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy
Code "to the extent consistent with SIPA." 15 U.S.C. § 78fff(b).

*Omnibus Good Faith Decision*, 531 B.R. at 470); *see also Greiff*, 476 B.R. at 725  (concluding that the fraudulent transfers from BLMIS were not "for value," because "[u]nlike the situation under § 546(e), Congress has here created no 'safe harbor' to shelter receipts that might otherwise be subject to avoidance.").

3.  **The *Section 546(e) Decision* Did Not Determine The Enforceability Or Validity Of BLMIS Customers' Securities Contracts And Settlement Payments**

Defendants maintain that the Second Circuit determined that—even where BLMIS defrauded its customers by not trading securities—Defendants "have enforceable securities contracts that gave rise to settlement payments and contractual payments."  (Objections at 36.) However, the Second Circuit never stated that the contracts between BLMIS and its customers were "enforceable" securities contracts, or that the transfers BLMIS customers received were valid settlement payments.  *Id.*  Significantly, the Second Circuit did not include customer statements when it considered whether BLMIS entered into agreements with customers.  Instead, its analysis was grounded upon the customers' account opening documents.  *Section 546(e) Decision,* 773 F.3d at 418.

Contrary to Defendants' statements, the Second Circuit did not state that each purported settlement payment to Defendants satisfied unavoided obligations owed by the broker and, in doing so, conferred value to BLMIS at the time of each transfer.  (*See e.g.,* Objections at 22-23.) Nor did the Second Circuit assert that such "securities contracts" and/or "settlement payments" were valid, real securities transactions as reflected on Defendants' BLMIS account statements. In fact, the Second Circuit subsequently affirmed that it "continue[s] to refuse, however, to 'treat[] fictitious and arbitrarily assigned paper profits as real'" and to give "legal effect to Madoff's machinations."  *Second Circuit Inter-Account Decision,* 697 F. App'x at 713 (citing *Second Circuit Net Equity Decision*, 654 F.3d at 235).

Rather, the Second Circuit simply affirmed that BLMIS's payments to its customers were subject to the safe harbor of section 546(e) because: (1) the customers' account opening documents constituted "agreements by which BLMIS [would] 'acquire or dispose of securities' on behalf of its customers," and thus "f[e]ll within the statute's broad definition of 'securities contracts'", and (2) the securities transactions contemplated by the customers' account opening documents were also "settlement payment[s]." *Section 546(e) Decision,* 773 F.3d at 417-19 (citing 11 U.S.C. § 741(7)(A)(i)).  The Second Circuit stated that there is a "low bar for the required relationship between the securities contract and the transfer[s] sought to be avoided," but it also stated that those transfers were made "in connection with" a "Ponzi scheme and, as a result, were fraudulent."  *Id.* at 422.

The Bankruptcy Court thus correctly determined that the *Section 546(e) Decision* has limited reach and that it does not foreclose the Trustee from avoiding and recovering transfers of fictitious profits in this case. *Report and Recommendations,* 2018 WL 1442312, at *12. As the Second Circuit held, section "546(e) is expressly *inapplicable* to claims of actual fraud brought under § 548(a)(1)(A)…" *Section 546(e) Decision,* 773 F.3d at 416 (emphasis added).  By exempting section 548(a)(1)(A) from section 546(e), Congress determined that obtaining "an equitable result for the debtor and its creditors" is "paramount" with regard to actual fraudulent transfers.  *See*, *id.* at 423.  Accordingly, the Bankruptcy Court did not violate any purported mandate, because none is present here.  Instead, the Bankruptcy Court continued to consistently apply the law of this case.

**4.     The Second Circuit's *Silverman* Decision Is Applicable Authority**

Despite Defendants' protestations, *Silverman* is relevant authority, and the Bankruptcy Court was correct in citing to the decision.  *See Report and Recommendations,* 2018 WL 1442312, at *13 (*Silverman,* 633 F. App'x at 17).  As the Bankruptcy Court stated, the well-

20

accepted rule that a transferee does not give value beyond principal deposited was "recently reinforced" in *Silverman*, in which a trustee sued a transferee in bankruptcy court under New York's constructive fraudulent conveyance law and successfully recovered the amount of the net gain the transferee had received from a Ponzi scheme. *Id.*

The District Court considering the *Silverman* appeal agreed, noting that in Ponzi scheme cases "many courts have concluded that such statutes allow those investors to retain their principal, but not any profits or interest." *Silverman v. Cullin*, No. 14 Civ. 4248 (JMA), 2015 WL 1509583, at *2 (E.D.N.Y. Mar. 31, 2015) (collecting cases). The Second Circuit similarly affirmed, stating "other courts of appeals have held that payments of 'interest' to Ponzi scheme investors should be treated as fraudulent transfers, because 'fair consideration' is not present in the context of such schemes." *Silverman*, 633 Fed. Appx. at 17 (collecting cases)). The Second Circuit acknowledged that it had not yet addressed this issue, but made clear that "the prevailing view in the district and bankruptcy courts in this Circuit has agreed with this consensus." *Id.* (citing *Omnibus Good Faith Decision*, 531 B.R. at 462-64 (collecting cases)); *see also Report and Recommendations,* 2018 WL 1442312, at *13.

Consistent with its ruling in *Silverman,* the Second Circuit recently affirmed that BLMIS customers cannot be credited for inter-account transfers of fictitious profits between BLMIS accounts because the "paper profits reflected in an inter-account transfer are equivalent to the paper profits reflected in a BLMIS customer's last account statement—any amount greater than the invested principal was 'wholly the contention of Madoff' and is properly excluded from calculation of a customer's 'net equity.'" *Second Circuit Inter-Account Decision,* 2017 WL 2376567, at *1 (citing *Second Circuit Net Equity Decision,* 654 F.3d at 237-38) (affirming the Trustee's net equity methodology as applied to inter-account transfers (the "Inter-Account

Method"), and noting that the court cannot give credence to transfers of "fictitious profits reflected in [a] transferor's BLMIS account statement").

As a result, it was entirely appropriate for the Bankruptcy Court to look to *Silverman* as further support for its conclusion that Defendants did not give value beyond their principal investments with BLMIS.

## IV.   THE *ANTECEDENT DEBT DECISION* REMAINS LAW OF THE CASE AND APPLICABLE TO THE TRUSTEE'S AVOIDANCE ACTIONS

The Bankruptcy Court correctly determined that the *Section 546(e) Decision* has no impact on the precedential effect of earlier decisions in these proceedings as they specifically relate to the value defense, including *Greiff* and *Antecedent Debt Decision*. Defendants disagree, arguing that they cannot be constrained by the *Antecedent Debt Decision* because it did not address "later-raised affirmative defenses or later-stipulated facts." (Objections at 38-41.) However, Defendants are bound by the *Antecedent Debt Decision* pursuant to the *Antecedent Debt Order*. Defendants participated in the drafting of the *Antecedent Debt Order* and cannot now try to circumvent terms they agreed to. The *Antecedent Debt Order* required that all arguments relating to antecedent debt, including the § 548(c) value defense, be raised in the antecedent debt proceedings. Defendants raised and litigated the value defense unsuccessfully. Defendants are now precluded by the *Antecedent Debt Order* from again raising the § 548(c) value defense.

Furthermore, it is inaccurate to characterize the *Antecedent Debt Decision* as outdated when the District Court issued the *Antecedent Debt Decision* on October 15, 2013, over a year and half *after* its own decision on section 546(e) on April 30, 2012—the *Greiff* decision—which the Second Circuit subsequently upheld in the *Section 546(e) Decision*. *See generally Greiff*, 476 B.R. 715; *Antecedent Debt Decision,* 499 B.R. 416. Given the timeline of the decisions, the

Second Circuit could have addressed the mandate of the *Antecedent Debt Decision* had it been so inclined.  It is simply not clear what purported "later affirmative defenses" arose that would make the *Antecedent Debt Decision* "inapposite" to the *Section 546(e) Decision,* as Defendants repeatedly claim.  (Objections at 38-41.)

### A.    Defendants Are Violating The Antecedent Debt Order Once Again

Defendants insist they have not violated the Antecedent Debt Order because it provided that the proceeding "is without prejudice to . . . any matter that cannot properly be raised or resolved on a Rule 12 motion, all of which are preserved."  (Objections at 40, n. 19.)  Defendants argue that because the *Antecedent Debt Decision* "never mentioned Section 29(b) [of the 1934 Act], did not engage in any reasoning on the enforceability of state law obligations of the broker to its customers, and cannot be construed to have decided for all purposes a defense not apparent on the face of the complaints," any facts and/or questions of law relating to section 29(b) were preserved.  (Objections at 40.)  However, even a cursory review of the *Antecedent Debt Decision* reveals this is untrue.

First, the Bankruptcy Court thoroughly considered Defendants' defenses under the 1934 Act—and did so in part by describing all the other times it and other courts have considered (and rejected) them.  *See Report and Recommendations*, 2018 WL 1442312, at *6-9.  Second, Defendants did not just "mention" section 29(b) in their Antecedent Debt Brief.  Instead, Defendants argued that they had "federal and state claims" in addition to their original principal investments" and stated that "[t]he 1934 Act contains an express statutory remedy of rescission in Section 29(b), as well as the implied rescission remedies available under Rule 10b-5 . . ." Antecedent Debt Brief, at *4.  Defendants asserted that "SIPA cannot fairly be read to displace those federal claims, since they are in the very statute of which SIPA was made part." *Id.* Defendants added later in their moving papers for the Antecedent Debt consolidated briefings

that "[s]ection 29(b) of the 1934 Act also entitles Defendants to void their investment contracts and receive ancillary remedies. Where Section 29(b) is invoked, the available remedy is rescission, including return of the consideration paid and 'interest thereon.'" *Id.* at *9 (citing 15 U.S.C. § 78cc(b), n. 13-14); *see also id.* at *17. As for state law obligations, Defendants demanded the District Court grant their motion to dismiss because Defendants were purportedly entitled to a defense based on "any obligations of Madoff Securities cognizable by state law not avoided or avoidable by the Trustee under Section 548(a)(1), including those occurring outside the applicable Reach-Back Period." *Id.* at *47; *see also* *2-3, 23-25. Defendants also cited to the New York Uniform Commercial Code § 8-501 in their Antecedent Debt Brief to assert that "as a matter of New York law, the monthly statements that Madoff Securities sent to them created an enforceable contract claim against the brokerage firm for the value of the investments reflected on the statements." *Id.* at *44. Defendants' arguments now to this Court that section 29(b) defenses and state law obligations were not raised and considered by the *Antecedent Debt Decision* is therefore astonishing, and demonstrably false.

Third, Judge Rakoff did in fact consider and rely upon both section 29(b) and state law obligations in deciding the *Antecedent Debt Decision,* stating that even if Defendants held valid claims under federal securities laws or state law, the claims did not provide value as against the BLMIS customer property estate under SIPA:

> Defendants also argue that . . . rescission aside, they can assert claims against Madoff Securities for violations of Rule 10b–5, 17 C.F.R. § 240.10b–5, violations of § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), and the right to void their investment contracts under § 29(b) of the 1934 Act, 15 U.S.C. § 78cc(b), as well as New York state claims for fraud and breach of fiduciary duty. Because the Court finds that such claims cannot provide value as against the Madoff Securities customer property estate under SIPA, it does not reach whether defendants have a claim for damages under such theories or ancillary issues such as whether the statute of limitations has run on these claims.

24

*Antecedent Debt Decision,* 499 B.R. at 422, n. 6.   Judge Rakoff denied Defendants' motion to dismiss on all the above grounds, and accordingly, Defendants were precluded from raising these arguments in subsequent briefings.  *Id.* at 430.

   **B.**      **There Is No Basis To Treat Equity Investors Differently Than Retail Customers**

   The Bankruptcy Court correctly followed the District Court's direction in *Greiff* that the manner of a person or entity's investment in a Ponzi scheme is not the determining factor in the treatment of fictitious profits.  *See Report and Recommendations,* 2018 WL 1442312, at *13. Even though *Greiff* was determined in the context of a motion to dismiss, the legal principals underpinning the decision apply to these cases.

   As the District Court noted in *Greiff*, Defendants' parsing "is a distinction without a difference"[25] because Defendants "faced the same risks as equity investors."  *Greiff*, 476 B.R. at 726.  The District Court stated:

> Any entitlement defendants had to a return on their investment, then, depended on a representation that Madoff Securities had in fact generated a profit.  The complaints allege that Madoff Securities' representations in this regard were wholly fraudulent.  Thus, defendants, in effect, ask the Court to enforce the fraud on the ground that the vehicle of this particular Ponzi scheme, in contrast to others, styled itself as a stockbroker.  Such a distinction pays only lip service to the underlying realities of the Ponzi scheme, and the Court rejects it.

*Id.* at 726-27.  In other words, whether Defendants were "equity investors" or "retail securities customers" is immaterial—Defendants are not entitled to retain the fictitious profits received from BLMIS.  The holding of the *Antecedent Debt Decision* remains in full force and effect.[26]

---

[25] Defendants insist that they are retail customers because they want the benefit of the relevant securities laws, but as the Bankruptcy Court explained in its *Report and Recommendations*, and as discussed at length in Section V. A. *infra*, SIPA does not shield Defendants from their avoidance liability.
[26] The *Antecedent Debt Decision* did not rest on the ground that BLMIS's customer contracts were not enforceable by innocent customers, as Defendants incorrectly asserted in their moving papers. (Objections at 37.)

## V.     THE BANKRUPTCY COURT PROPERLY CONSIDERED AND APPLIED SIPA, THE BANKRUPTCY CODE AND RELATED RULES TO THIS PROCEEDING

Defendants' primary defense is that BLMIS owed antecedent debts or "obligations" to them, which were satisfied by the payment of fictitious profits.  Therefore, Defendants' argue, the fictitious profits were received for "value" under Section 548(c) of the Bankruptcy Code. (Objections at 16-26.)  In reviewing these arguments, the Bankruptcy Court acknowledged that this defense is "neither new nor untested," noting that Defendants previously asserted, and the District Court rejected, this defense in the *Antecedent Debt Decision*.  *Report and Recommendations,* 2018 WL 1442312 at *5.  At its core, Defendants' argument reflects a fundamental misunderstanding of the interplay between SIPA and the Bankruptcy Code.

### A.     Defendants' Fraudulent Transfers Constitute Customer Property in a SIPA Proceeding

As correctly recognized by the Bankruptcy Court, the money the Trustee seeks to recover became "customer property" upon its deposit with BLMIS.  *See Report and Recommendations,* 2018 WL 1442312, at *10.  Customer property under SIPA is "cash and securities . . . *at any time* received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, *and the proceeds of any such property transferred by the debtor, including property unlawfully converted . . .*"  SIPA § 78*lll*(4) (emphasis added).  This customer property definition also includes other debtor property that a trustee must allocate to the fund of customer property as necessary to remedy the debtor's non-compliance with its obligation to hold and segregate customer property.  SIPA § 78lll(4)(D).[27]

---

[27] While in operation, broker-dealers are required to segregate customer property under SEC "customer protection rules."  17 C.F.R. § 240.15c3-3 (the "Customer Protection Rule"). Once a broker-dealer goes into liquidation under SIPA, the SIPA designation of customer property is the seamless continuation of Rule 15c3-3, taking effect the moment the broker-dealer fails.  *In re Lehman Bros. Holdings, Inc.*, 445 B.R. 143, 191-92 (Bankr. S.D.N.Y. 2011).

The SIPA definition of customer property ensures that when the debtor transfers property it received from the customer, such property remains "customer property" subject to the special protections of SIPA.  SIPA § 78*lll*(4) (including in the definition of customer property "the proceeds of *any such property* transferred by the debtor, including property unlawfully converted") (emphasis added); *see also Dowden v. Cross County Bank (In re Brittenum),* 97 B.R. 503 (E.D. Ark. 1987) (holding that deposits held pursuant to the Customer Protection Rule are not subject to bank's setoff claim because it is customer property); 17 C.F.R. § 240.15c3-3(f) (explaining that an account holding customer property under the Customer Protection Rule cannot be subject to a bank lien because it consists of customer property).  This broad definition recognizes customers' rights to the property they gave to their broker for safekeeping, even if the debtor wrongfully transferred it to others.

### B.      SIPA Empowers a Trustee to Recover Customer Property

The Bankruptcy Court correctly applied the plain language of SIPA, the mandate of the *Antecedent Debt Decision*, and the Bankruptcy Code to the facts of these cases when it ruled that the Trustee may avoid and recover the Transfers regardless of whether Defendants filed customer claims.  Defendants' argument that the Bankruptcy Court transformed this avoidance proceeding into a SIPA claims proceeding by applying SIPA's concept of payment of "net equity" to Defendants is misplaced.  (Objections at 43-47.)

The concept of customer property cannot be divorced from avoidance actions in a SIPA proceeding.  SIPA § 78fff-2(c)(3) provides that certain property "shall be deemed to have been the property of the debtor," and specifies that "the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property" to the extent that the transfer "is voidable or void" under the Bankruptcy Code, and "[s]uch recovered property shall be treated as customer property" and is "deemed to have been the property of the

debtor." *Id.*  This very expansive definition of customer property is "an intended fiction."  *Hill v. Spencer Savings & Loan Assoc. (In re Bevill Bresler, Inc.),* 83 B.R. 880, 894 (D.N.J. 1988).  Its purpose is "'to enable the trustee to fit the transfer into the avoidance sections of the Code.'"  *Id.* (quoting 4 Collier on Bankruptcy ¶ 749.02[2], at 749-3 (15th ed. 1987)).  Congress drafted SIPA § 78fff-2(c)(3),[28] along with SIPA § 78eee(b)(2)(A), to provide SIPA trustees with expansive authority to marshal assets, wherever located, for the benefit of customers when assets are missing, such as when property is missing from Rule 15c3-3 custodial accounts.  *Bevill Bresler*, 83 B.R. at 895.  Thus, the Bankruptcy Court correctly determined that a customer's net equity is relevant, because "the assertion of a general damage claim as an offset against the recovery of customer property has the same effect as the assertion of that claim against the customer property estate."  *Report and Recommendations* at *7.

When a broker improperly transfers customer property, SIPA authorizes the trustee to recover it using the Bankruptcy Code.  *See e.g.,* SIPA § 78fff-1(a) (providing a SIPA trustee with the same rights as a bankruptcy trustee, including the right to avoid preferences); SIPA § 78fff-2(c)(3) (a "trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property"); *Section 546(e) Decision*, 773 F.3d at 414 ("Under SIPA, a trustee is empowered to 'recover' (or claw back) money paid out by the debtor, as long as the money 'would have been customer property' had the payment not occurred and, the transfers could be avoided under the Bankruptcy Code.") (quoting SIPA § 78fff-2(c)(3)).  SIPA § 78fff-2(c)(3) is designed "to recover securities that would have been part of the fund of

---

[28] Contrary to Defendants' assertions, the Bankruptcy Court properly cited section 78fff-2(c)(3) to explain the two different estates in a SIPA case:  the fund of customer property and the general estate.  Section 78fff-2(c)(3) also clarifies what constitutes "customer property" by showing that when the fund of customer property is insufficient, a trustee may recover customer property that had been transferred away from the debtor.  *See e.g., Report and Recommendations,* 2018 WL 1442312, at *4, n. 13, 7; *see also Antecedent Debt Decision*, 499 B.R. at 419-21.

customer property but for a prior transfer to a customer." *Bevill, Bresler*, 83 B.R. at 893. "The inquiry in an avoidance action, therefore, is: if the transfer did not occur, would the securities have been part of the fund of customer property?" *Id.* If the answer is yes, then that cash or securities are customer property subject to recovery by SIPA trustees.

To avoid having to return customer property that does not belong to them, Defendants conflate definitions of "property" under the Bankruptcy Code with customer property under SIPA. They argue the transfers here are neither customer property nor property of the debtor, because transferred property does not become "property of the estate" until *after* the transfers are avoided and recovered. Regardless of whether moneys transferred by a SIPA-protected broker dealer pre-petition are considered "property of the estate" under Bankruptcy Code section 541(a)(1) prior to recovery, they are still at all times considered customer property under SIPA. *See* SIPA § 78*lll*(4). One has nothing to do with the other.

In an effort to have it both ways, Defendants argue that this very same language in SIPA § 78fff-2(c)(3) supports their temporal definition of customer property, arguing that certain language in SIPA § 78fff-2(c)(3)—*i.e.*, "such recovered property shall be deemed as customer property"—"mirrors" Bankruptcy Code section 541(a)(3) and would be "wholly redundant" if the unavoided funds were treated as customer property from the inception of the SIPA case. (Objections at 46-47.) In other words, Defendants claim "customer property" must be avoided and recovered before it can be treated as such. (*Id.*) However, Defendants' argument is a fallacy: if the only "customer property" in a case was property already in the Trustee's possession, SIPA trustees could never bring an avoidance action under SIPA § 78fff-2(c)(3).

To interpret customer property as narrowly as Defendants suggest would also resurrect the very ills that SIPA and its predecessor (section 60e of the Chandler Act amendments to the

former Bankruptcy Act in 1938) were passed to cure.  Previously, a broker's customers could only recover whatever property the debtor was fortuitously holding on the date of the collapse because a trustee could not avoid transfers.  Michael E. Don & Josephine Wang, *Stockbroker Liquidations under the Securities Investor Protection Act and Their Impact on Securities Transfers*, 12 Cardozo L. Rev. 509, 520–523, 548 (1990) describing pre-1938 liquidations, and protections of 60e of the Chandler Act and SIPA). The Chandler Act and SIPA remedied this uneven treatment by allowing a trustee to recover customer property whenever the fund of customer property is insufficient to pay customer claims.  *Id.* at 548 (citing SIPA section 78fff-2(c)(3)); *see also Trefny v. Bear Stearns Sec. Corp.*, 243 B.R. 300, 322 (S.D. Tex. 1999) (the purpose of 78fff-2(c)(3) is "to prevent one or more customers from depriving other customers of assets by keeping these assets out of the 'pool' available for distribution to customers on a ratable basis."); *infra* Section VI. A. addressing the protection of customer property.

While Defendants repeat their assertions that section 548(c) is a limitation on the Trustee's avoidance powers (Objections at 16-17, 29-31), both the District Court and Bankruptcy Court made clear that "such a characterization conflates two separate concepts" because "[s]ection 548(a)(1) empowers a trustee to avoid the entirety of a fraudulent transfer, while section 548(c) provides an affirmative defense that allows a defendant to retain portions of that otherwise entirely avoidable transfer."  *Antecedent Debt Decision,* 499 B.R. at 423-24 (citing *In re Bayou Grp., LLC ("Bayou II"),* 362 B.R. 624, 629 (Bankr. S.D.N.Y.2007) (explaining that section 548(a)(1)(A) "avoids the *entire* amount of 'any transfer' which was made by the transferor with actual intent to hinder, delay or defraud creditors. Moreover, the entirety of the transfer is avoidable whether or not the debtor received value in exchange . . ." (emphasis in original)); *see also Report and Recommendations,* 2018 WL 1442312, at *7.  Thus, to the extent

that SIPA limits the Trustee's avoidance powers to those transfers that are "void or voidable" under the Bankruptcy Code, "that provision merely gives the Trustee the authority to rely on section 548(a)(1)(A). It does not necessarily imply that section 548(c)'s affirmative defense must apply in the same way to the customer property estate as it would to the general estate." *Antecedent Debt Decision,* 499 B.R. at 424; *see also Report and Recommendations,* 2018 WL 1442312, at *7.

To the extent Defendants' purported value defense could permit them "to withhold funds beyond [their] net-equity share of customer property," Defendants are effectively "making those damages claims against the customer property estate" and allowing such claims "to be drawn out of the customer property estate [in a way that] would violate SIPA." *Antecedent Debt Decision,* 499 B.R. at 424 (citing *Greiff*, 476 B.R. at 728 ("[W]hen determining whether a[ ] transferee provides value, SIPA requires consideration not only of whether the transfer diminishes the resources available for creditors generally, but also whether it depletes the resources available for the satisfaction of customers' net equity claims and other priority claims.")). Indeed, "[t]he satisfaction of non-net equity claims from the customer property estate would defeat the priority that SIPA intended customers to have against the separate and distinct customer property estate." *Cohen Decision*, 2016 WL 1695296, at *8; *c.f. In re A.R. Baron Co., Inc.*, 226 B.R. 790, 796 (Bankr. S.D.N.Y. 1998) ("It is well established that claims based on a debtor's failure to execute securities trades are not 'customer' claims which a trustee may satisfy with SIPC funds or Customer Property. Rather, these claims are general unsecured breach of contract claims."). Thus, under SIPA, Defendants may only seek the protections of section 548(c) to the extent of investments of principal.

C.     **The Second Circuit's *Colonial Realty* and *Fairfield* Decisions Do Not Undermine The Bankruptcy Court's Report and Recommendations**

Defendants rely on the Second Circuit's decisions in *Fairfield* and *Colonial Realty*, and specifically the rule articulated in *Colonial Realty* that transferred property does not become property of the debtor's estate until after it is recovered, to assert that "SIPA's provisions provide no special power over unavoided transfers beyond those in ordinary bankruptcy liquidations." (Objections at 45 (citing *Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199, 212 (2d Cir. 2014); *In re Colonial Realty Co.,* 980 F.2d 125, 131 (2d Cir. 1992).)  Defendants argue that because property cannot become property of the estate before it is recovered, a SIPA trustee cannot rely on property being "customer property" until it is recovered.  (Objections at 45.)  However, Defendants' efforts to characterize *Colonial Realty* and *Fairfield* as undermining the Bankruptcy Court's *Report and Recommendations* are without merit, as those decisions have no bearing on the issues here.

In *Fairfield,*  the Second Circuit held—in the context of an injunction motion brought by the Trustee to prevent the potential dissipation of a defendant's fund—that the fraudulent transfers at issue in the Trustee's action were not property of the estate under *Colonial Realty* any more than if brought by a non-SIPA trustee.  762 F.3d at 212.  Contrary to Defendants' assertions, *Fairfield* did not involve any analysis of the relationship between the customer property estate and the calculation of value as an affirmative defense to an avoidance action, inside or outside of a SIPA liquidation.

Moreover, the Bankruptcy Court previously considered and rejected this very argument in the *Omnibus Good Faith Decision,* rejecting the argument that *Fairfield* was not "intervening authority" that "undercut Judge Rakoff's analysis of value in a SIPA case."  531 B.R. at 468-71. The Bankruptcy Court also noted that *Fairfield* did not address the question of value in any

respect, and reiterated the well-settled law of this case that "[f]ictitious profits are not profits at all but distributions of other people's money based on an arbitrary allocation of fraudulent bookkeeping entries.   The [ ] Second Circuit decision[ ] did not address this rule and it remains the majority view." *Id.* at 469-70.

Nothing in *Colonial Realty* or *Fairfield* limits the ability of a trustee, whether in a SIPA or non-SIPA bankruptcy liquidation, to recover fraudulent transfers.  Instead, as *Colonial Realty* stated, Congress deliberately authorized trustees to seek avoidance and recovery of "property of the debtor."   980 F.2d at 131.  This category is broader than "property of the estate," as it must be, because otherwise *no* transfer could ever be avoided and recovered under sections 548 and 550.  *See* 11 U.S.C. § 548(a)(1) (the Trustee may avoid any transfer of "an interest of the debtor in property"); § 550 (Trustee may recover any avoided transfer from the initial or any immediate or mediate transferee). [29] Defendants' contrary position would render the Bankruptcy Code's avoidance provisions nugatory—the only property that could be recovered would be property that had already been recovered—and is therefore illogical.

Defendants overreach by arguing that this illogical inference also extends to customer property; according to Defendants, a trustee may only treat property as "customer property" once it is in the debtor's possession (Objections at 46-47), and thus the Trustee cannot rely on SIPA to recover property that would have been customer property but for the transfer.  This argument

---

[29] Defendants assert that, in addition to *Fairfield* and the *Section 546(e) Decision, Picard v. JPMorgan Chase Bank & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54 (2d Cir. 2013)  also "teach[es] that the SIPA claims process is wholly irrelevant in deciding avoidance cases," (Objections at 41), but *JPMorgan* only addressed the Trustee's lack of standing to assert common law claims against third parties, and has no bearing here. *See Omnibus Good Faith Decision*, 531 B.R. at 450 (citing *JPMorgan*, 721 F.3d at 67).  Defendants further state that the *Second Circuit Inter-Account Decision* also "reaffirmed that net equity principles have no application to avoidance cases," (Objections at 42, n. 22), but that is far from what the court concluded.  Instead, the Second Circuit simply affirmed the Trustee's choice of methodology in determining the net equity of BLMIS customer accounts where inter-account transfers were made, reiterating that "it does not change the real value of the account absent fictitious profits." *See Second Circuit Inter-Account Decision*, 697 F. App'x at 712.

ignores the express statutory language in SIPA section 78fff-2(c)(3), which states that a "trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property . . ." Defendants cannot rely on either *Colonial Realty* or *Fairfield* to support their attenuated argument.

### D.  Defendants' Repeated Arguments About SIPA and Section 548(c) Fail as a Matter of Law

In reaching its conclusions in the *Report and Recommendations*, the Bankruptcy Court analyzed SIPA, securities regulations and the Bankruptcy Code, and correctly determined that under the facts of these cases, Defendants did not provide value in exchange for fictitious profits.

The Bankruptcy Court accurately explained that a transferee only provides value for his/her deposits of principal in both SIPA and non-SIPA Ponzi scheme cases. *Report and Recommendations*, 2018 WL 1442312, at *8 (citing *Cohen Decision,* 2016 WL 1695296, at *10–11); *see also Silverman,* 633 F. App'x. at 17 (holding that fair consideration is not present for interest payments in a Ponzi scheme).[30] The Bankruptcy Court also looked at the rules governing broker-dealers pre-liquidation, particularly the "Customer Protection Rule," 17 CFR § 240.15c3-3, and explained that, even outside the context of a broker-dealer liquidation, a broker-dealer is required to maintain a customer's cash and securities. *Id.* at *11. As the Bankruptcy Court explained, "In the end, BLMIS stole customer funds to pay fictitious profits in satisfaction of BLMIS' own liabilities. A thief has no right to steal another person's property simply because he is obligated to pay it back." *Id.* at *12.

---

[30] *See also Greiff,* 476 B.R. at 725; *Donell,* 533 F.3d at 771–72; *Scholes,* 56 F.3d at 757; and *In re Hedged–Invs. Assocs., Inc.*, 84 F.3d at 1290.

### 1.   Defendants' "At The Time Of Transfer" Argument Has No Relevance In A Ponzi Scheme

Defendants' argument that the value defense under section 548(c) is measured "at the time of the transfer and from the transferee's perspective" (Objections at 18-19, 58-59), is irrelevant because Defendants have conceded BLMIS was operating a Ponzi scheme at all times relevant to the Avoidance Actions.  (Joint Stipulation ¶ 10.)  Defendants further conceded that the investment advisory business (the "IA Business") through which they were invested "did not actually trade securities for customers and did not generate any legitimate profits for customer accounts."  (Joint Stipulation ¶ 13.)  Defendants also stipulated that "[a]t all times, BLMIS defrauded [Defendants] by intentionally misrepresenting the purported securities transactions in the Accounts.  These misrepresentations . . . were an integral and essential part of the fraud, and were made to avoid detection of the fraud, retain existing investors, and to lure other investors into the Ponzi scheme."  (Joint Stipulation ¶ 50.)

Defendants argue that the existence of the Ponzi scheme has no bearing here.  However, if there were no legitimate trades of securities in Defendants' BLMIS accounts at all relevant times, then there can be no "valid" antecedent debts and/or obligations for BLMIS to have satisfied "at the time of" each fraudulent transfer of other people's money to Defendants, regardless of whose perspective is employed.[31]  As a result, not a single transfer of "profits" Defendants received as BLMIS customers satisfied a "valid" debt or obligation, as "*all* of the

---

[31] Defendants cite to several cases in support of their position that the value defense is calculated at the time of transfer, but the cases fail to support Defendants' argument because they all addressed real transactions or the exchange of real goods and/or services, which is clearly not applicable here.  *See e.g., BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (real estate conveyance); *McHenry v. Dillworth (In re Caribbean Fuels Am., Inc),* No. 16-15786, 2017 WL 2703541 (11th Cir. June 22, 2017) (lease of home); *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.),* 310 F.3d 796, 802 (5th Cir. 2002) (real estate property option); *Redmond v. SpiritBank (In re Brooke Corp.),* 541 B.R. 492 (Bankr. D. Kan. 2015) (option agreement/certificate of deposit); *Dobin v. Hill (In re Hill),* 342 B.R. 183 (Bankr. D.N.J. 2006) (division of marital property); *Baldi v. Lynch (In re McCook Metals, LLC),* 319 B.R. 570 (Bankr. N.D. Ill. 2005) (right to acquire smelting plant).

transfers are presumptively fraudulent, as in the case of a Ponzi scheme." *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.),* No. 06-12737 (SMB), 2009 WL 3806683, at \*13 n. 19 (Bankr. S.D.N.Y. Nov. 10, 2009) (emphasis added).

The District Court also rejected this line of argument in the *Antecedent Debt Decision*, making clear that "even if defendants held legitimate discretionary brokerage accounts with Madoff Securities, they would have been entitled only to the securities in their accounts on the date of demand, and therefore older statements would have been unenforceable in any case." 499 B.R. at 421 n. 4.

### 2. Madoff's Purported Obligations To Defendants Do Not Provide Value, Nor Does The Trustee Have To Avoid <u>Any</u> Such Obligations

Throughout their Objections, Defendants argue that the Bankruptcy Court erred in granting the Trustee summary judgment when "the Trustee failed to satisfy an essential predicate to recovery of transfers: avoiding of any [sic] the obligations incurred by Madoff Securities within the two year reach back limit of Section 548." (Objections at 71.)  Defendants argue that without the obligations being avoided, "the Trustee cannot defeat the value defense, because each transfer to a Defendant *indisputably* was made in satisfaction of an enforceable and unavoided obligation owed by Madoff Securities at the time of each transfer." (*Id.*) (emphasis in original).

However, this argument fails.  The District Court has previously held that BLMIS's account statements do not create enforceable obligations owed by BLMIS.  For example, in the *Antecedent Debt Decision*, to which Defendants remain bound, the District Court rejected "defendants' contention that [BLMIS's] pre-reach-back-period account statements constitute binding obligations of Madoff Securities to its customers that the Trustee must avoid."  499 B.R. at 421 n. 4; *see also Omnibus Good Faith Decision*, 531 B.R. at 476 n. 26.  Likewise in *Greiff*,

the District Court found that the amounts reported on account statements were wholly fraudulent and therefore unenforceable.  476 B.R. at 726-27.  More recently, the Bankruptcy Court made it clear that any "argument that payment in satisfaction of an unavoided obligation provides value misses the point . . . payments in excess of principal are avoidable and recoverable (in all Ponzi scheme cases) and violate the priority rules of SIPA (in SIPA Ponzi scheme cases)."  *Cohen Decision,* 2016 WL 1695296, at *12 n.17.

### 3. Defendants' Oft Repeated State Law Arguments Remain Unavailing

Defendants also seek to rely on long-rejected state law arguments.  Although Defendants claim otherwise, the Second Circuit in its *Section 546(e) Decision* did not assert that Article 8 of New York's Uniform Commercial Code ("U.C.C") gave rise to valid obligations owed by BLMIS to its customers.  (*See* Objections at 19-20 (asserting the *Section 546(e) Decision* recognized that the U.C.C. "gives brokerage customers a right to payment of the full value of securities positions reported to them").)  Such asserted obligations are neither stated nor implied in the *Section 546(e) Decision*.  The Second Circuit only references the U.C.C. in the context of the definition of "settlement payment[s]" under section 546(e), which the Second Circuit construed to apply to "the transfer of cash or securities made to complete [a] securities transaction."  *Section 546(e) Decision,* 773 F.3d. at 422 (citing N.Y. U.C.C. § 8–501(b)(1) & cmt. 2).  However, it does not follow that in a SIPA liquidation, any purported obligations owed by BLMIS under the U.C.C. provide a defense to Defendants for the receipt of fictitious profits.  *See e.g., Cohen Decision,* 2016 WL 1695296, at *12.  Instead, the *Section 546(e) Decision* only reinforces the correctness of the *Report and Recommendations* and the Trustee's position, as the Second Circuit made clear it "would be 'absurd' to calculate customers' net equity using BLMIS's fictitious account statements, because that would 'have the . . . effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to Madoff's

machinations.'"  773 F.3d at 423 (citing *Second Circuit Net Equity Decision*, 654 F.3d at 235); *see also Second Circuit Inter-Account Decision*, 697 F. App'x at 713 (same).[32]  In fact, the Official Comment to the U.C.C. itself, expressly citing the Bankruptcy Code and SIPA as examples, provides that both the Bankruptcy Code and SIPA override the U.C.C. if the entity's affairs are being administered in an insolvency proceeding.  *See* U.C.C. [Rev.] § 8-503, Official Comment 1 (2009) ("applicable insolvency law governs how the various parties having claims against the firm are treated. For example, the distributional rules for stockbroker liquidation proceedings under the Bankruptcy Code and Securities Investor Protection Act" govern).  Thus, Defendants' arguments favoring the application of the U.C.C. are in direct conflict with the Bankruptcy Code and SIPA and cannot succeed.

Finally, the cases cited by Defendants in support of their argument that they are entitled to keep fictitious profits because the transfers were made in satisfaction of "state law obligations" (Objections at 20-23) are inapplicable.[33]  Defendants' cases do not involve Ponzi schemes, nor do they involve SIPA liquidations, and thus they provide no assistance in the instant case where the relevant body of case law instead involves how to divide a limited fund of customer property for priority distribution to customers.  *See e.g.*, *Cox*, 526 B.R. 786 (denying motion for reconsideration of decision granting creditor's summary judgment motion based on

---

[32] Defendants cite to *Cox v. Nostaw (In re Central. Ill. Energy Coop.),* 526 B.R. 786, 791 (Bankr. C.D. Ill. 2015) to assert that "[w]here a debtor makes prepetition payments on a contractual debt, in order for those payments to be avoidable as constructively fraudulent, it is necessary for the trustee to first avoid the underlying contract as a fraudulently incurred obligation."  (Objections at 72.)  However, here there were no contractual debts owed by BLMIS to Defendants, nor did fraudulent payments in excess of principal satisfy any obligation of BLMIS.  In addition, the Trustee is only pursuing claims of actual fraud brought under § 548(a)(1)(A), not claims of constructive fraud.

[33] The District Court has previously recognized that non-bankruptcy law also provides that claims for fictitious profits are not valid contractual state law claims, *Antecedent Debt Decision*, 499 B.R. at 421, n. 4 (citing *In re Hedged Inv. Assocs., Inc.*, 84 F.3d at 1290), and that claims for interest on principal have been rejected in non-SIPA bankruptcy cases as well.  *Id.* at 422 (citing *In re Bayou Group, LLC*, 439 B.R. at 337).

issues determined by Illinois law in the context of a construction contract); *Jahn v. Char (In re Incentium, LLC)*, 473 B.R. 264 (Bankr. E.D. Tenn. 2012) (granting summary judgment for former officer and dismissing trustee's adversary proceeding seeking to avoid the separation agreement between the debtor and the former officer and avoid severance payments); *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012) (involving allegations that defendant bank improperly used its position to extract additional collateral from the debtor shortly before the debtor filed for bankruptcy protection); *In re Asia Global Crossing Ltd.*, 333 B.R. 199 (Bankr. S.D.N.Y. 1999) (proof of claim objection based on the debtor's entry into a guaranty of certain obligations of its affiliate).

### 4.    Permitting Enforcement of Unenforceable Contracts Pursuant to Section 29(b) of the 1934 Act Would Dilute The Fund Of Customer Property

Attempting to frame an old argument anew, Defendants emphasize that the inclusion of SIPA as "a section of" the Securities Exchange Act of 1934 (the "1934 Act") makes Section 29(b) dispositive in their quest to retain fictitious profits from a Ponzi scheme by permitting them to enforce their fraudulent statements.  Specifically, Defendants argue that "Section 29(b), gave only the innocent customer the option of enforcing any securities contractual obligation against the fraudster."  (Objections at 23.)  That BLMIS was operating a Ponzi scheme is, according to Defendants, "legally insignificant."

However, as courts have consistently held, enforcing BLMIS's purported obligations "would further none of the policies generally favoring enforcement by an innocent party to an illegal bargain," because "any award of damages would have to be paid out of money rightfully belonging to other victims of the Ponzi scheme."  *Omnibus Good Faith Decision*, 531 B.R. at 463 (quoting *Janvey*, 767 F.3d at 442 (internal quotations omitted)); *see also Dicello v. Jenkins*

*(In re Int'l Loan Network, Inc.),* 160 B.R. 1, 15 (Bankr. D.D.C. 1993) (refusing to enforce investors' restitution claims in Ponzi scheme on public policy grounds, stating that "on public policy grounds, the defendants ought not be rewarded for having been lucky enough to be amongst the few coming in at the start of the pyramid scheme"); *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R. 843, 858, 870 (D.Utah 1987) (same, stating "the contracts involved in this case were unenforceable to the extent they purported to give the defendants a right to payments in excess of their undertaking" and "to enforce the contract as to fictitious profits would only further the debtors' fraudulent scheme"). Defendants offer no case law holding otherwise and instead rely exclusively on cases that do not involve a Ponzi scheme.[34]

Defendants' other arguments that section 29(b) permits a party to either enforce a contract or seek rescission have no bearing here, and their unsupported assertions that they could seek rescission at all are directly contrary to SIPA. (Objections at 21-22, 40.) First, when courts have previously considered a defendant's rescission claims to determine the amount of "value" provided under 548(c), those courts have held that those rescission claims are limited to the amount of principal. *See Donell*, 533 F.3d at 77; *Bayou II,* 396 B.R. at 844. This purported claim is not relevant here because the Trustee is only seeking the return of fictitious profits. Defendants have provided no authority in support of a rescission claim beyond their principal investments.

Second, under SIPA, a rescission claim is never a "customer claim." *See SEC v. JNT Investors, Inc.*, No. 72 Civ. 681, 1978 WL 1137, at *1-2 (S.D.N.Y. Feb. 9, 1978) (customer

---

[34] *See e.g, Freeman v. Marine Midland Bank-N.Y.,* 419 F. Supp. 440 (E.D.N.Y. 1976) (declaratory relief action on ground that bank had extended credit in violation of federal margin requirements); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375 (1970) (action to set aside corporate merger achieved via use of materially false or misleading proxy statement); *Found. Ventures, LLC v. F2G, LTD.,* No. 08 Civ. 10066 (PKL), 2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010) (action for breach of contract and unjust enrichment relating to contract to identify qualified investors to provide equity financing).

claims for fraud, breach of contract, conversion or rescission are not customer claims within the meaning of SIPA); *SEC v. S. J. Salmon & Co.*, 375 F. Supp. 867, 870-71 (S.D.N.Y. 1974) (finding that a claim for fraudulent inducement and rescission is not a customer claim under SIPA, but may be brought as a fraud claim by a general creditor to be satisfied out of the general estate, not the single and separate customer property fund).   Even if Defendants asserted their rescission claims against BLMIS, those claims would be against the general estate, not the fund of customer property.   These general estate claims cannot form the basis of value to offset fraudulent transfers of customer property under section 548(c) in a SIPA case.   *See Antecedent Debt Decision*, 499 B.R. at 419-21; *supra* at Section VI. B.   Thus, Defendants' purported rescission claims would have no effect on the Trustee's claim for fictitious profits.

### 5. Defendants' Asserted Adjustments Under State Or Federal Law Do Not Constitute Value Under Section 548(c)

Finally, Defendants argue that the Bankruptcy Court failed to recognize remedies, adjustments, or setoffs they claim to be entitled to under federal or state law.   (Objections at 12-13, 73-74.)   Defendants specifically argue that the Bankruptcy Court should have determined that, "in addition to their contractual and statutory rights, the antecedent tort remedies existing at the time of the transfer[s] also entitle Defendants to summary judgment of the amount of the stipulated damages and pre-judgment interest arising from such claims."   (*Id.* at 73-74.) Defendants explain that they retained an expert "to quantify their lost opportunity costs resulting from their having unwittingly left their funds with Madoff Securities" (*id.* at 12), and state that "had an honest broker managed these funds, Defendants would have received agreed returns as

stipulated by the parties." (*Id.* at 74.)[35]  For the reasons previously stated by the Bankruptcy Court, the District Court, and the Second Circuit, Defendants are not entitled to any adjustments.

First, the New York statute that Defendants cited in support of prejudgment interest has no application here.  Section 5001 of the New York Civil Practice Law and Rules authorizes interest only "upon a sum awarded," which requires a judgment in favor of Defendants, which is not the case here.[36]  *See Bayou IV*, 439 B.R. at 337-38.  Second, Defendants' arguments to recover interest or "lost time value resulting from [the] fraud" (Objections at 75), has already been rejected by the District Court and the Second Circuit.

In the *Antecedent Debt Decision*, the District Court ruled that net winners were not entitled to interest payments.  499 B.R. at 422 (rejecting claims for interest in excess of principal).  Further, in 2015, the Second Circuit affirmed the Bankruptcy Court's decision that BLMIS customers were not entitled under SIPA to adjustments to their claims to account for any form of time-based damages, including those relating to lost opportunity costs or the consumer price index ("CPI").  *See generally Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* (*In re Madoff Sec.*), 779 F.3d 74 (2d Cir. 2015) (*"Time-Based Damages Decision"*).  There, the Second Circuit held that "BLMIS customers were not entitled to an inflation or interest adjustment to their net equity claims because SIPA did not permit it."  *Cohen Decision,* 2016

---

[35] The Trustee did not stipulate to agreed hypothetical returns, as suggested by Defendants. The fact that the Trustee stipulated that he was not "contesting and will not object to the conclusions set out" by Defendants' expert (Joint Stipulation ¶ 62) has no bearing on the legal analysis of whether the award of such damages and/or interest was appropriate or not. Defendants are not entitled to any such amounts.

[36] Defendants' reliance on Stephen Behnke (Joint Stipulation ¶ 57), and New York Civil Practice Law and Rules section 5001, to seek compensation for lost opportunity damages is further basis to award prejudgment interest at 9% per year in favor of the Trustee and the net loser victims based on what the net loser victims could have obtained over the last decade (since 2008) that Defendants have been withholding fictitious profits. For Defendants to try to assert that net loser victims—who have not been able to recover their principal investments—should not be entitled to that same interest rate, is disingenuous at best. *See supra* n.12. Even more, the notion that the net loser victims who have not recovered their principal investment should further bear the expense of an interest rate adjustment in favor of net winners to the net losers' further detriment is absurd.

WL 1695296, at *14 (citing *Time-Based Damages Decision,* 779 F.3d. at 79-80.  The Second Circuit determined that "an inflation adjustment to net equity claims" would allocate value to the earlier investors "at the expense of customers who have not yet recovered the property they placed in Madoff's hands." *Time-Based Damages Decision,* 779 F.3d. at 81.  Thus, an inflation or other time-based damages adjustment violated SIPA's statutory structure. *Id.*  The Second Circuit further determined that such an adjustment also violated the purpose of SIPA, which was to distribute customer property to customers, not to provide full protection to all victims of a brokerage's collapse. *See id.* ("The purpose of determining net equity under SIPA is to facilitate the proportional distribution of customer property actually held by the broker, not to restore to customers the value of the property that they originally invested.").

Although the Second Circuit's *Time-Based Damages Decision* answered a different but related question involving net equity under SIPA, rather than value under section 548(c), the logic and rationale of the decision equally resolves the question as to value under section 548(c). As the District Court explained, the calculation to determine a customer's net equity is the same calculation used to determine a customer's avoidance liability, provided the customer had no knowledge of the fraud. *See Antecedent Debt Decision*, 499 B.R. at 420.  In both cases, the Trustee nets deposits against withdrawals: "[a] customer who withdrew less than she deposited over the course of her investment with Madoff Securities has a net-equity claim and may be entitled to disbursements from the customer property estate for the amount of that net equity," and customers "who withdraw more money from their accounts than they deposited" are subject to "avoidance actions for the amount in excess of their deposits." *Id.* at 420-21.[37]

---

[37] Defendants' argument that the Bankruptcy Court erred because it allegedly "wholly ignored...and failed to make any findings of law or fact regarding this defense" is simply false.  (Objections at 6, 73-75.)  The Bankruptcy Court made clear that it "ha[d] reviewed the Defendants' arguments, and *to the extent not*

## VI.    THE BANKRUPTCY COURT DID NOT GRANT THE TRUSTEE AN UNPLEADED CLAIM BASED ON THE SEC'S FINANCIAL RESPONSIBILITY RULES AGAINST DEFENDANTS

Defendants argue that the Bankruptcy Court granted the Trustee an unpleaded claim under the SEC's Customer Protection Rule.   (Objections at 48-49.)   Yet nothing in the Bankruptcy Court's language or decision suggests that it created such a claim.   *See Report and Recommendations,* 2018 WL 1442312, at *10-12.   Instead, during the course of oral arguments on the Parties' motions for summary judgment, the Bankruptcy Court requested briefing on a broker-dealer's obligations prior to a SIPA liquidation.   *See e.g.,* Tr. of Hearing at 64-65, 70, *Picard v. Lowrey, et. al.,* Adv. Pro. No.  10-04387 (SMB) (Bankr. S.D.N.Y. Dec. 6, 2017).   This question resulted in Judge Bernstein's request that the Parties provide the Bankruptcy Court with letter briefs on the SEC's Customer Protection Rule.   Despite Defendants' protestations that they were "deprive[d] . . .of procedural due process," the Parties each had the full opportunity to brief this issue post-hearing, and in fact did so.[38]

Defendants argue that the Customer Protection Rule does not create a private right of action, and that even if it did, an action would be brought by the SEC against the broker. However, this argument is irrelevant because the Trustee is not asserting a claim under the Customer Protection Rule.   (Objections at 51-53.)   Defendants also assert that there was no stipulated  violation  of  the  SEC  Customer  Protection  Rule  (*id.*  at  53-54),  but  Defendants

---

*addressed herein*, concludes that they lack merit or are moot."  *Report and Recommendations,* 2018 WL 1442312, at *15 (emphasis added).

[38] The Parties filed supplementary letter briefs to address the Bankruptcy Court's questions.  *See* ECF Nos. 96-97.   Defendants subsequently filed additional, unapproved letters regarding purportedly "pertinent and significant authority that supports their summary judgment motions," and specifically their assertions that (i) property must first be avoided and recovered before it may be treated as "property of the estate" or "customer property" (ECF No. 100) and (ii) "the text of SIPA and the Bankruptcy Code must be enforced as written, without regard to whether such enforcement limits the overall recovery for the SIPA estate."  (ECF No. 103)  As the Trustee noted in his response letters, none of the authorities cited by Defendants was actually pertinent.  *See* ECF Nos. 101, 104.

stipulated that BLMIS operated a Ponzi scheme. (Joint Stipulation ¶ 10.)  By definition, a Ponzi scheme is insolvent.  *See Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC),* 458 B.R. 87, 118 (Bankr. S.D.N.Y. 2011).    Thus, again by definition, broker-dealers operating Ponzi schemes have a shortfall of customer property in violation of the Customer Protection Rule.  In addition, whether the broker-dealer actually held funds in a segregated account is not relevant. *See Barclays Capital Inc. v. Giddens (In re Lehman Bros. Inc.),* 478 B.R. 570, 595 (S.D.N.Y. 2012) (noting that the Customer Property Rule requires customer property to be protected "at all times").   And, in response to Defendants' argument that the Customer Protection Rule only requires the broker-dealer to replenish stolen funds but does not prohibit the theft in the first place (Objections at 50-51, 56-57), the Bankruptcy Court explained that a broker-dealer has no right to steal customer property "simply because he is obligated to pay it back."  *Report and Recommendations,* 2018 WL 1442312, at *12.

The Bankruptcy Court's conclusions hardly constitute the creation of a new right of action.    The fact remains that the Trustee is asserting only those statutory claims that he is empowered to bring pursuant to SIPA and the Bankruptcy Code.  He also "is not asserting any common law claims that belonged to the creditors under nonbankruptcy law."  *Cohen Decision,* 531 B.R. at 450 (noting the inapplicability of *JPMorgan*, 721 F.3d 54)).

A.    **As The Customer Protection Rule Makes Clear, Customer Property Cannot Be Used To Satisfy Valid Debts Of Broker-Dealer**

While the Trustee is not asserting a claim under the Customer Protection Rule, it does provide further support for the Trustee's position, which was the crux of the Trustee's supplemental letter brief.  *See* ECF No. 97.  The Rule requires broker-dealers to segregate and protect customer property.  Pursuant to a Congressional mandate in SIPA, the SEC enacted this rule to separate "customer related activities from other broker dealer operations."  Customers'

Securities and Funds, Exchange Act Release No. 9775, 1972 WL 125434, at *1 (Sept. 14, 1972); SIPA 84 Stat. 1653; Public Law 91-598 sec. 7(d) (1970).  These rules ensure that the customer property held by the broker-dealer will be available for distribution to customers even in the event of financial failure of the firm.  *See* Broker-Dealers; Maintenance of Certain Basic Reserves, Exchange Act Release No. 34-9856, 1972 WL 125352 at *2 (Nov. 13, 1972) (noting that one reason for adopting rules is "[t]o facilitate the liquidations of insolvent broker-dealers and to protect customer assets in the event of a SIPC liquidation through a clear delineation in Rule 15c3-3 of specifically identifiable property of customers").

Failure to comply with the Customer Protection Rule can lead to the commencement of a SIPA liquidation.  *See* SIPA § 78eee(b)(1)(C).  And in the event a U.S. broker-dealer does go into liquidation under SIPA, customer property becomes even more important because the entire purpose of a SIPA proceeding is to promptly return that property to the debtor's customers. SIPA accomplishes this by, inter alia, defining "customer property" to include any cash or securities deposited by customers for the purpose of purchasing securities, regardless of whether the broker-dealer treated the assets as customer property under the Customer Protection Rule. SIPA § 78lll(4) (defining it as cash and securities at any time received by the debtor for the purpose of purchasing securities).

Despite Defendants' arguments to the contrary, the Customer Protection Rule is relevant to show the complete scheme Congress created to protect customer property, starting from the minute a customer deposits cash and securities with a broker-dealer.  The SEC enacted the Customer Protection Rule to protect customers by "eliminat[ing] the use by broker-dealers of customer funds and securities to finance firm overhead and such firm activities as trading and underwriting through the separation of customer related activities from other broker-dealer

operations." Customers' Securities and Funds, Exchange Act Release No. 9775, 1972 WL 125434, at *1 (Sept. 14, 1972).   By design, the Customer Property Rule ensures that all cash and securities owed by a broker-dealer to its customers are available for return to them at any time, and upon liquidation.  Michael P. Jamroz, *The Customer Protection Rule*, 57 Bus. Law. 1069, 1071-74 (2002).  The Customer Protection Rule protects the property while it is in the possession of the broker-dealers, and in a SIPA liquidation, the segregated accounts form the fund of customer property for distribution to customers.   Thus, customer property as a concept exists well before a SIPA liquidation even commences.   As the Bankruptcy Court correctly stated, the Customer Protection Rule provides further proof that the customer property does not belong to the debtor, and could not have been used by the debtor to satisfy unrelated valid debts.  *Report and Recommendations,* 2018 WL 1442312, at *11 ("The use of customer funds for this purpose was the equivalent of the forbidden practice of making customer property 'vulnerable to claims made against the broker-dealer by third parties.'") (citing *In the Matter of Merrill Lynch, Pearce, Fenner & Smith Inc.,* Exchange Act Release No. 78,141, 2016 WL 4363431, at *1 (June 23, 2016).  For example, with respect to securities, the rule prohibits a broker-dealer from using a customer's fully paid and excess margin securities in any aspect of its business, and thus "a broker-dealer cannot sell them [without customer authorization,] lend them to others, use them to deliver against short sales, or use them as collateral for a loan."  Steven D. Lofchie, *Lofchie's Guide to Broker-Dealer Regulation* 481 (3d ed. 2005).  These rules protecting customer property from being used to satisfy non-customer property obligations in a pre-SIPA liquidation context carry through following a SIPA liquidation via statutory provisions of SIPA and the Bankruptcy Code, which permit a trustee to avoid and recover transfers of customer property that were used

to pay non-customer property debts or were otherwise fraudulent.  *See e.g.,* SIPA §§ 78fff-2(c)(3), 78*lll*(4); Bankruptcy Code §§ 548(a)(1)(A), 550(b).

Defendants also make arguments about the Customer Protection Rule that ultimately do not turn on the rule itself, but rather on other SIPA and bankruptcy issues previously raised and rejected.  For example, Defendants argue that the Customer Protection Rule does not prohibit a broker from paying a "valid debt" to a customer "at the time of payment."  (Objections at 50-51.)  However, this argument presumes that Defendants' debt is "valid," which the District Court and the Bankruptcy Court both agreed it was not.  *Antecedent Debt Decision*, 499 B.R. at 422-26 ("Under this view, to effectuate SIPA's mandate, a customer may only seek the protections of section 548(c) to the extent of investments of principal, and federal and state law claims cannot be used to increase the amount to which a customer is entitled from the customer property estate."); *Report and Recommendations,* 2018 WL 1442312, at *12.  Similarly, Defendants point out that "nothing stated in this section shall be construed as affecting the absolute right of a customer of a broker or dealer. . . to receive . . . following demand made on the broker or dealer . . . [f]ully-paid securities to which he is entitled." 17 C.F.R. § 240.15c3-3(l).  This provision does not apply here precisely because the property at issue is not "fully-paid securities" to which Defendants would be entitled, but in fact were fictitious profits.

## VII.   THE TRUSTEE'S NETTING METHOD AND VALUE CALCULATIONS ARE WHOLLY CONSISTENT WITH THE SECTION 548(a) REACH-BACK PERIOD

The Bankruptcy Court properly rejected Defendants' affirmative defense that a purported "two-year statute of repose in Section 548(a)(1) bars the Trustee from avoiding Madoff Securities' obligations to Defendants . . . as they existed on December 10, 2006," (Objections at 15), noting that Defendants raised, and the District Court rejected, this exact argument in the

*Antecedent Debt Decision.*   *See e.g.,* Antecedent Debt Brief, at \*39-40; *Antecedent Debt Decision*, 499 B.R. at 427-28.

Indeed, as the District Court explained, Defendants are mischaracterizing the Trustee's use of the Net Investment Method (as defined below).   *See Antecedent Debt Decision,* 499 B.R. at 427.   The calculation of a good-faith BLMIS customer's avoidance liability is the same calculation used to determine a BLMIS customer's claim against the customer property fund.   *Id.* at 420.   Specifically, the Trustee nets life-to-date deposits against life-to-date withdrawals to determine whether a customer has positive or negative net equity (the "Net Investment Method").   If the customer has negative net equity (meaning they received fictitious profits), and they received any withdrawals from BLMIS in the two years before the Filing Date, the amount of those withdrawals constitutes the customer's avoidance liability.   *Id.* at 426-27, 430 (endorsing the Net Investment Method underlying the Trustee's avoidance liability calculations). The District Court concluded that while section 548(a)(1) permits the avoidance of only those transfers occurring in the Two-Year Period, "there is no similar limitation in section 548(c) . . .[and] there is no reason why a line should be drawn at the beginning of the reach-back period in determining whether a transfer was for value." *Id.* at 427 (citing 11 U.S.C. § 548(a)(1)(A)).

Defendants argued that the Supreme Court's decision in *California Pub. Empls. Retirement Sys. v. ANZ Secs., Inc.*, 137 S. Ct. 2042 (2017) ("*CalPERS*") required a different conclusion, but the Bankruptcy Court correctly determined that *CalPERS* "does not represent intervening law mandating a reexamination or modification of the reasoning or the result reached in the *Antecedent Debt Decision*."   *Report and Recommendations,* 2018 WL 1442312, at \*14. Despite Defendants' overwrought efforts to make *CalPERS* mean more than it did, the Supreme Court did not cite, review, or draw any comparisons to section 548 of the Bankruptcy Code. *Id.*

The same is true for Defendants' reliance on *CTS Corp. v. Waldburger*, 134 S. Ct. 2175 (2014) (finding the Comprehensive Environmental Response, Compensation, and Liability Act's discovery rule preempts only state statutes of limitation and not statutes of repose).

Even if section 548(a)(1) were to be interpreted as a statute of repose, the Bankruptcy Court explained that the Trustee's methodology is wholly consistent with section 548(a) because it does not seek to avoid any fraudulent transfers or purported "obligations" beyond the two-year look-back period. *Report and Recommendations,* 2018 WL 1442312, at 14. Instead, the Trustee has limited his claims against Defendants to seek the avoidance and recovery of transfers made only on and after December 11, 2006. *Id.* This is entirely consistent with the cases cited by Defendants. For example, in *In re Sandburg Mall Realty Mgmt. LLC*, the court held that "[t]ransfers that are more than two years old are not avoidable, as measured from the date that the transfers were made." 563 B.R. 875, 896 (Bankr. C.D. Ill. 2017). Similarly, in *In re Petters Co.*, the court stated that the two-year look-back period is a "substantive element of a § 548 claim" as it refers "to the universe of transfers that are avoidable under § 548." 557 B.R. 711, 713 (Bankr. D. Minn. 2016) (citing *Indus. Enters. of Am. v. Tabor Academy, et al., (In re Pitt Penn Holding Co.*), No. 09-1475 (BLS) 2011 WL 4352373, at *3 (Bankr. D. Del. Sept. 16, 2011)).

Defendants further contend that the *Antecedent Debt Decision* improperly relied on the Ninth Circuit's decision in *Donell v. Kowell*, 533 F.3d 762 (9th Cir. 2008), which Defendants argue interpreted a statute of limitations in the California Uniform Fraudulent Transfers Act (UFTA) and not a statute of repose. (Objections at 68 n. 30.) But cases relying on *Donell* and applying its reasoning to a statute of repose in the California UFTA have used the same netting method as the Trustee. For example, in *Donell v. Mojtahedian*, 976 F.Supp.2d 1183 (C.D. Cal.

2013) ("*Mojtahedian*"), the receiver for a Ponzi scheme investment fund brought an action under the California UFTA against a fund investor, seeking to recover the investor's alleged profit from the investment.  The defendant sought to limit her liability to withdrawals in the seven-year period set out in Cal. Civ. Code sec. 3439.09(c), as netted against her life-to-date principal investment.  *Mojtahedian*, 976 F. Supp. 2d at 1189.   Relying on *Donell*, the court held that defendant was incorrect and required netting to consider not just the defendant's life-to-date deposits but also her life-to-date withdrawals.  *Id.*   Recognizing that section 3439.09(c) is a statute of repose and the section interpreted by *Donell* was a statute of limitations, the court nevertheless advised "[t]here is no reason to believe the Ninth Circuit's ruling on the statute of limitations does not also apply to the statute of repose."  *Id.*

Here, too, there is no basis to challenge the Trustee's netting method even if the section 548(a) reach-back period is construed as a statute of repose. Indeed, the ruling in *Mojtahedian* is consistent with non-Madoff cases that have approved netting methods referring to life-to-date withdrawals and deposits of principal, as recognized in the Antecedent Debt Decision.  *See, e.g., Hedged-Inv. Assocs.,* 84 F.3d at 1288-90 (calculating the amount received in excess of principal deposited over the life of the defendant's investment for purposes of determining defendant's avoidance liability); *Bayou IV,* 439 B.R. at 338-39 (in Ponzi scheme case, affirming bankruptcy court decision determining avoidance liability based on deposits of principal and withdrawals made over the investment relationship).

In addition, as the cases relied upon by Defendants indicate, the relevance of the statute of repose designation largely relates to whether a limitation period can be tolled.  (Objections at 68-69.)  The Trustee's methodology does not involve the equitable tolling of any statutory period: the Trustee's methodology does not permit the Trustee to stop the clock from running on

his avoidance actions.  In contrast to an action to avoid and recover such transfers, the Trustee's calculation methodology "us[es] past transactions as part of the process of calculating a customer's net equity."  *See In re Bernard L. Madoff Inv. Secs. LLC*, No. 15 Civ. 1151 (PAE), 2016 WL 183492, at *17 (S.D.N.Y. Jan. 14, 2016) (the *"District Court Inter-Account Decision"*).  In other words, "the two-year reach-back limit applicable to attempts to avoid fraudulent transfers does not apply to a Trustee's calculation of net equity" because "[n]othing in the text of section 548(a)(1) indicates that the two-year restrictions applies to anything other than an avoidance action for fraudulent transfers."  *Id.* at *12.  Distinct from equitable tolling, it does not give the Trustee greater power to claw back transfers beyond the two-year reach-back period. [39]  Rather, it is a straightforward application of section 548(a) to the Trustee's net equity calculation, as repeatedly affirmed by three levels of courts.  Defendants' reliance on *CalPERS* is misplaced.

## CONCLUSION

For the reasons argued below before the Bankruptcy Court, and discussed herein, the Trustee respectfully requests that the District Court adopt the Bankruptcy Court's *Report and Recommendations* in its entirety, and enter a final judgment in favor of the Trustee and against Defendants in the aggregate sum of $41,295,673.[40]

---

[39] Defendants' cited cases are in line with the *District Court Inter-Account Decision,* as none suggests that the reach back period under section 548(a) is a limitation on the Trustee's net equity methodology. *See e.g.*, *In re Maui Indus. Loan & Fin. Co.,* 454 B.R. 133, 136 (Bankr. D. Haw. 2011); *In re Lyon*, 360 B.R. 749, 750 (Bankr. E.D.N.C. 2007); *In re Bethune,* 18 B.R. 418, 419 (Bankr. N.D. Ala. 1982) (noting section 548(a) as one-year reach back period prior to enactment of Bankruptcy Abuse Prevention and Consumer Protection Act of 2005); *In re Davis,* 138 B.R. 106, 108 (Bankr. M.D. Fla. 1992) (noting that the reach-back period "does not constitute a statute of limitations and has no bearing on the trustee's powers under other sections").

[40] The Trustee reiterates his request and entitlement to prejudgment interest on the fraudulent transfers. *See supra* n. 13.

Dated: New York, New York
June 1, 2018


Of Counsel:

BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Suite 1100
Washington, DC 20036
Telephone: (202) 861-1500
Facsimile: (202) 861- 1783
Kendall E. Wangsgard
Email: kwangsgard@bakerlaw.com

BAKER & HOSTETLER LLP

By: */s/ Keith R. Murphy*
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com
Nicholas J. Cremona
Email: ncremona@bakerlaw.com
Heather J. McDonald
Email: hmcdonald@bakerlaw.com
Elyssa S. Kates
Email: ekates@bakerlaw.com
Anat Maytal
Email: amaytal@bakerlaw.com
Maximillian S. Shifrin
Email: mshifrin@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee for
the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the Estate
of Bernard L. Madoff*